CLARENCE E. MeMANUS, Judge.
| {Defendant, Eric B. Massey, appeals his conviction of second degree murder. For the reasons which follow, we affirm his conviction and sentence.

STATEMENT OF THE CASE

On January 25, 2007, a Jefferson Parish Grand Jury returned an indictment charging defendant, Eric B. Massey, with the second degree murder of Harold Bush, alleged to have occurred on November 24, 2006, in violation of LSA-R.S. 14:30.1. Co-defendant, Brian K. Massey, defendant’s brother, was also charged with the second degree murder of Harold Bush in the same indictment. Defendant was arraigned on January 30, 2007, and pled not guilty. Defendant then filed several pretrial motions, including motions to suppress evidence and identification, and a motion to sever the defendants for trial, all of which were denied.
Trial of this matter commenced before a 12-person jury on August 26-30, 2010. After considering the evidence presented, the jury found both of the defendants guilty as charged. On September 9, 2010, the trial court sentenced defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence. On that same date, defendant filed a motion for appeal which was granted by the trial court. The defendant now timely appeals his conviction.
[.¡FACTS
The following facts were elicited at the trial of this matter. On October 12, 2006, approximately a month and a half before the murder of Harold Bush, Brian Massey, co-defendant and brother of the defendant, was involved in a shooting in which he was shot in the foot. The individual who shot the defendant was never arrested. However, Brian Massey told officers that he believed a man by the name of Johnny Bush, either a cousin or brother of the murder victim, had shot him.
Two days prior to the murder, on November 22, 2006, a second shooting occurred at the Beachgrove Apartments. One of the gunshot victims was identified as Emmanuel Massey, a relative of the defendant and Brian Massey, and the other gunshot victim was Lee January, an associate of Brian Massey. Brian Massey was on the scene of the shooting at the time detectives arrived, and given his relationship to the victims, he was believed to be a witness to the shooting.
*458 On November 24, 2006, Harold Bush was shot and killed. The State presented the eyewitness testimony of Courtney Washington at trial. Washington testified that she has known the defendant and his brother Brian Massey since 2004. Washington testified that shortly after Brian Massey was released from the hospital for the gunshot wound he sustained to his foot, and before the murder of Bush, she saw the defendant, his brother Brian Massey, and a man named Delance in Elliott’s Gun Shop buying bullets and clips.
In November 2006, at the time of the murder, Washington was living in a FEMA trailer in the Davis Development in Westwego. Washington testified that on November 24, 2006, she had seen Bush and a man by the name of Brindell in the neighborhood. After meeting up with them at a neighbor’s house, Washington testified that Bush and Brindell eventually left and headed down Emile Street through a “cut” between Dolly and Heather Streets to go buy some “weed” while |4she stayed behind. Washington stated that around 6:00 p.m. she began to head back to her trailer located at the corner of Wayne and Dolly Streets. While walking down Wayne Street toward the trailer, Washington saw a white truck which she described as “[n]ot like a Ford F150 or something like that ... [i]t was smaller than a suburban truck,” driving slowly down the street. Washington testified that she could see Brian Massey driving, the defendant in the front passenger seat, and another person by the name of De-lance in the vehicle. When she observed the defendant and Brian Massey driving down the street she hid behind a bush so they could not see her. The vehicle passed her and proceeded down Wayne Street toward Heather Street. Washington then testified that after crossing the street and climbing the stairs to her trailer, she heard four gunshots. Upon hearing the gunshots she looked towards Emile Street, down Dolly Street, and observed the Massey vehicle in the middle of the street and the defendant, Brian Massey, and Bush standing on the corner of Dolly and Emile.
Washington then testified that she observed Brian Massey holding a weapon she described as “[a] big one, like a long one. Probably a little longer than my arm,” and the defendant holding “a small one.” Also, after turning around, Washington stated that she saw “fire” coming from the gun Brian Massey was holding while he shot at Bush. Washington further testified that the defendant and Brian Massey then got back into the white vehicle and sped off.
Once the police arrived, Washington positively identified the victim for them as Harold Bush. Washington testified that she did not tell the police what she had witnessed that evening because she was scared of the Massey brothers and their friends.
Eventually, however, Washington did tell the police that she had witnessed the murder. Washington testified that on December 10, 2006, she filed a complaint 1 ¿against her husband for domestic violence. When the police arrived at her house, she was wearing a shirt with Bush’s picture on it which prompted the officer to ask her if she knew Bush. She then told the officer everything she knew about the incident, and agreed to go to the police station to speak with lead detective Morales. While speaking to Detective Morales at the police station, Washington testified that she was presented with two photographic line-ups from which she positively identified both the defendant and Brian Massey.
The State also called Dr. Susan Garcia, of the Jefferson Parish Coroner’s Office, to the stand who testified as an expert in the *459 field of forensic pathology. Dr. Garcia performed the autopsy on the victim, Harold Bush, the day after his murder, November 25, 2006. Dr. Garcia testified that the victim sustained eight gunshot wounds to his body, some of which caused lethal injury to multiple organ systems in his abdomen. Upon performing the autopsy, Dr. Garcia stated that one deformed intact projectile was recovered from the victim’s left thigh, and some projectile fragments were recovered from various parts of the victim’s body. Dr. Garcia also noted that the “gaping” exit wound on the victim’s shoulder was characteristic of a high-powered weapon. Dr. Garcia classified the manner of death as a homicide, noting that the victim did not die instantly, but rather bled to death given the location of the victim’s injuries to two of his major arteries.
Next, Deputy Wade Hotard of the Jefferson Parish Sheriffs Office, testified that on November 24, 2006, at approximately 6:14 p.m., he was dispatched to the corner of Dolly and Emile Streets, the scene of the homicide. Around the vicinity of the victim’s body, Deputy Hotard testified that he observed several 7.62 caliber shell casings, and one 9 mm shell casing. Subsequent to Deputy Hotard’s arrival on the scene, a witness later identified as Ms. Sherman Davis, identified the victim |6as Harold Bush. Deputy Hotard further testified that his attempt to locate eye witnesses was unsuccessful.
Captain Dennis Thorton, of the Jefferson Parish Sheriffs Office Homicide Division, testified that on the evening of November 24, 2006, he responded to a homicide on Dolly and Emile Streets in Westwego. As the supervisor of the crime scene investigation, Captain Thor-ton recounted the evidence recovered and documented at the crime scene, which included six bullet casings from a 7.62 by 39 millimeter weapon, likely an SKS or AK47 assault rifle, and one bullet casing from a 9 mm semiautomatic handgun. Captain Thorton further testified that no weapons were recovered at the scene or on the victim’s person. Additionally, a gunshot residue test performed on the victim’s hands turned out negative. After Captain Thorton concluded his investigation and supervision of the crime scene, the case was turned over to case officer Detective David Morales.
Detective David Morales testified that on November 24, 2006, he was employed as a detective for the Jefferson Parish Sheriffs Office and participated in the investigation pertaining to the homicide of Harold Bush. After speaking with his supervisor, Lieutenant Steve Buras, about the homicide that had occurred the evening before, Detective Morales went to 7205 Angela Street, two blocks from the crime scene, to speak with the victim’s aunt, Sherman Davis, who had identified the victim the night before. Detective Morales spoke with both Davis and the victim’s brother, Jonathan Bush (a.k.a. “Johnny”) and as a result of his conversations with them, proceeded to an area known as the Beachgrove Apartments. Detective Morales learned that the victim had been living at 753 Beachgrove, Apartment D, and upon his arrival he spoke to Michelle Harris and Cedric Clinton. From Harris and Clinton, Detective Morales learned that the victim had been with a man by the name of Ron Sherman, also known as “LA,” at 17the time he was killed. Sherman agreed to meet with Detective Morales and provide a statement regarding the homicide but was unable to identify the individuals who shot Bush.
A few days later, after receiving a phone call from another detective regarding a potential witness in the case, Detective Morales interviewed and took a recorded *460 statement from Gerald Barker regarding the homicide. Detective Morales testified that Barker was presented with two-photographic line-ups, which contained pictures of the defendant, and co-defendant, Brian Massey. Based upon the information gained from Barker, including the interview and photographic line-up, Detective Morales secured arrest warrants for Eric Massey and Brian Massey for the murder of Harold Bush, and three search warrants.
Detective Morales stated that while proceeding with Detective Jeffrey Rodrigue towards 2120 Constantine in Marrero to execute one of the search warrants, they were advised that the defendant, co-defendant, and a female by the name of Shauna Hamilton, had left 2120 Constantine and were traveling in a red Pontiac Grand Am along Betty Street toward Lapalco. Brian Massey was driving, with his girlfriend, Shauna Hamilton in the front passenger seat, and the defendant in the back seat, directly behind the driver. After officers stopped their .vehicle, both the defendant and Brian Massey were arrested and a loaded 9 mm pistol was retrieved from the seat pouch directly in front of where the defendant was seated. A second 9 mm handgun was recovered from Brian Massey’s person, however, this handgun was not connected to the shooting of the victim.
Following the arrest of the defendant and Brian Massey, Detective Morales executed the search warrant at 2120 Constantine. Upon entering the house, detectives encountered Emmanuel Massey, nephew of Eric and Brian Massey, who had been the victim of the shooting that occurred at the Beachgrove Apartments | stwo days pri- or to the subject murder. Detective Morales seized several items from inside the home’s master bedroom including a U-Haul self-storage rental contract in Brian Massey’s name, an ID-card- belonging to Shauna Hamilton, correspondence addressed to Brian Massey, and thirty 7.62 by 39 caliber live cartridges concealed behind the bed’s headboard. Detective Morales also executed a search warrant at 2078 Mathers Drive in Marrero, believed to be the Massey family home, however, nothing of evidentiary value was found.
Sometime later, on December 10, 2006, Detective Morales was contacted by Officer Gary Barteige, who was handling a domestic violence complaint in the Wagga-man area of Jefferson Parish, when he learned that the domestic violence victim, Courtney Washington, may have knowledge regarding the murder of Harold Bush. Detective Morales testified that he interviewed Washington concerning the homicide of Bush, who indicated that she had witnessed the murder. During the interview, Washington was presented with the same two photographic line-ups shown to Barker, which contained a picture of the defendant and Brian Massey.
Detective Daniel Jewell, of the Jefferson Parish Sheriffs Office, Narcotics Division, testified that he participated in the arrest of the defendant and his brother, Brian Massey. Detective Jewell testified that he was conducting surveillance around the corner from 2120 Constantine, when he was notified that a vehicle containing the defendant and Brian Massey was leaving the residence. Detective Jewell and other assisting officers stopped the vehicle defendant was riding in and arrested the defendant and Brian Massey. Detective Jewell testified that he removed the defendant from the car who had been seated behind the driver seat. Detective Jewell then performed a cursory search of the vehicle and in the pouch |athat had been sewn into the back of the driver’s seat, directly in front of where the defendant had been seated, he seized a black pistol.
*461 Louise Walzer, senior crime examiner, who was employed by the Jefferson Parish Sheriffs Office Crime Laboratory at the time of the subject incident, testified on behalf of the State. After being qualified as an expert in the field of firearms examination, Walzer testified that she examined various firearms evidence in this case. Specifically, Walzer testified that she completed a comparison of the six 7.62 by 39 millimeter fired cartridge casings recovered at the scene and determined that they were all fired from the same weapon, either an AK-47 or SKS. Next, Walzer testified that after comparing the 9 mm gun retrieved from the red Pontiac, in the pouch in front of where the defendant was seated at the time of his arrest, to the 9 mm CBC casing found at the scene and the copper-jacketed bullet retrieved from the body of the victim, she concluded that the casing and bullet had been fired from the 9 mm weapon collected from the red Pontiac. Finally, Walzer testified that the live ammunition taken from the 9 mm pistol recovered from the seat pouch at the time of defendant’s arrest contained CBC live cartridges.
The State then called Connie Brown, laboratory director for the DNA Lab and DNA technical leader of the Jefferson Parish Sheriffs Office Regional DNA Lab, to the stand. After qualifying Brown as an expert in the field of forensic DNA analysis, Brown testified that she analyzed and compared swabs taken from the trigger and slide of the 9 mm handgun recovered from the red Pontiac pouch, to the DNA profile obtained from buccal swabs taken from the defendant and Brian Massey. Brown concluded that the DNA profile obtained from the swab of the slide of the 9 mm pistol was consistent with being a mixture of DNA from at least two individuals, and that the defendant could not be excluded as a donor of the |10DNA in the mixture. Brown further testified that no conclusions could be made regarding the inclusion or exclusion of Brian Massey due to the limited quality of the sample. However, Brown also testified that the defendant fell within the .1 percent of the Caucasian, African-American, and Hispanic population that could not be excluded as possible contributors of the DNA mixture. With regard to the second sample, the DNA profile obtained from the trigger of the 9 mm pistol, Brown testified that a mixture of DNA from at least two individuals was discovered, however, due to the limited quantity of DNA sample, no conclusions could be made regarding the inclusion or exclusion of the defendant or Brian Massey.
Lastly, Deputy Candice Emmanuel, assigned to the special investigation unit of the corrections center, testified that it is her responsibility to monitor and maintain the electronic system which records phone calls placed by inmates at the correctional facility. Deputy Emmanuel testified that pursuant to a subpoena received by the State, she prepared a compact disc of Brian Massey’s recorded telephone conversations. The State then played a telephone conversation recorded on April 28, 2010, between Brian Massey and his father. During the conversation, Brian Massey was heard telling his father to meet up with “LA” and to tell “LA” to go to his lawyer and give a recorded statement saying “that it wasn’t me and Brad who did that s* * *. Because he [LA] made a statement and he made the statement saying that he ... can’t identify the people who did it. But he said that he saw who did it, but he can’t identify them. He can identify me and Brad because he know us.... So all you got to do is let me lawyer record him on a tape saying it wasn’t Brad and Brian who did that, and they going to drop the f*⅜ * * *g charges.... Tell that n* * * *r I got *462 $500.00 and all for him just saying that, fool.”
_jjiThe State rested and the defense called Carolyn Van Winkle, employed by the Tarrant County Medical Examiner and Criminalist Laboratories in Fort Worth, Texas, to the stand. Van Winkle was qualified as an expert in the field of forensic DNA analysis, and testified that the DNA results from the slide of the 9 mm retrieved from the pouch in the red Pontiac was inconclusive as to the defendant. Van Winkle also testified that both the defendant and Brian Massey were excluded as major contributors of the DNA found on the slide of the 9 mm handgun. Van Winkle further testified that the quality of work performed by Brown, the State’s DNA expert analyst, was excellent, however, she disagreed with Brown’s conclusions and use of statistical analysis by providing an alternative way to analyze the level of data in this case.
ASSIGNMENT OF ERROR NUMBER FOUR[1]
On appeal, the defendant argues his conviction is based on four primary pieces of evidence that are insufficient to uphold his second degree murder conviction. Specifically, defendant asserts that the State presented (1) a jailhouse statement made by his co-defendant, Brian Massey, which the State should have never been able to hear; (2) a gun which was illegally seized; (3) DNA evidence from a gun which was contradicted by an expert presented by the defense; and (4) the unreliable eyewitness testimony of Courtney Washington.
In response, the State contends that the evidence presented at trial was sufficient to convict the defendant of the second degree murder of Bush. In particular, the State asserts that eyewitness testimony establishes the defendant’s 112presence at the scene of the crime, and that the defendant was holding a gun in close proximity to the victim. Moreover, the State argues that the recovery of the 9 mm handgun from a seat pouch directly in front of where defendant was sitting, was connected through ballistics and DNA evidence to the defendant and the murder. Thus, the State contends that it presented sufficient evidence at trial which was weighed by the jury who found that the State had established the essential elements of the crime charged.
The appropriate standard of review for determining the sufficiency of the evidence was established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). According to Jackson, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Id., 443 U.S. at 319, 99 S.Ct. 2781; See also State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); *463 State v. Holmes, 98-490, p. 3 (La.App. 5 Cir. 3/10/99), 735 So.2d 687, 690.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission of an offense, LSA-R.S. 15:438 provides that “ ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’ ” State v. Wooten, 99-181, p. 4 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining |lsthe existence of reasonable doubt. Id. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Wooten, 99-181 at 4-5, 738 So.2d at 675.
Here, defendant was charged with second degree murder. Second degree murder is defined as the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1.
Specific intent is defined as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” LSA-R.S. 14:10(1). Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Gant, 06-232, p. 8 (La. App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599; State v. Spears, 05-0964 (La.4/4/06), 929 So.2d 1219, 1224. Specific intent may be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. Id. The act of aiming a lethal weapon and discharging it in the victim’s direction supports a finding by the trier of fact that the defendant acted with specific intent to kill. Id. In addition, flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. Id.
Regardless of whether defendant fired the fatal shots, the evidence may be sufficient to prove he was at least a principal to second degree murder. Principals are defined as “all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.” LSA-R.S. 14:24. See also State v. Anderson, 97-301,14 p. 3 (La.2/6/98), 707 So.2d 1223, 1224 (per cu-riam). Only those persons who “knowingly participate in the planning or execution of a crime” are principals to that crime. State v. Pierre, 93-0893, p. 4 (La.2/3/94), 631 So.2d 427, 428 (per curiam). Mere presence at the scene of a crime does not make one a principal to the crime. Id. A person may be convicted of an offense even if he has not personally fired the fatal shot. The Law of Principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. State v. Schwander, 345 So.2d 1173, 1174-75 (La.1977). Whether a defendant actually fires the bullet that strikes and kills a victim is of no consequence and the defendant may be convict *464 ed as a principal to the crime. State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422; see also State v. Hampton, 98-331, p. 13 (La.4/23/99), 750 So.2d 867, 880, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). However, a principal may be connected only to those crimes for which he has the requisite mental state. State v. Holmes, 388 So.2d 722 (La.1980); State v. McAllister, 366 So.2d 1340 (La.1978).
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the defendant’s identity as the perpetrator. State v. Draughn, 05-1825, p. 8 (La.1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). “ ‘As a general matter, when the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the [s]tate is required to negate any reasonable probability of misidentification.’ ” Id., (quoting State v. Neal, 00-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002)). Positive identification by one witness is sufficient to support a conviction. State v. Harris, 07-124, p. 4 (La.App. 5 Cir. 9/25/07), 968 So.2d 187, 193.
| isThe credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, and credibility will not be reweighed on appeal. State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. A reviewing court may impinge on the fact-finder’s discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Harris, 02-1589, p. 4 (La.5/20/03), 846 So.2d 709, 713 (citing State v. Mussall, 523 So.2d 1305, 1310 (La.1988)). By returning a guilty verdict, the jury obviously believed the testimony of the State’s witnesses, including their experts, over that of the defense’s witnesses.
Courtney Washington, an eyewitness, testified that she had seen the defendant and his brother, Brian Massey, in a white truck, driving slowly through the neighborhood shortly before the shooting. Additionally, Washington testified that she was standing on the steps leading up to her trailer when she heard gunshots and turned around and again saw the white truck in the middle of the street with the defendant, and his brother, Brian Massey, standing by the victim. And although Washington testified that she only saw Brian Massey shoot at the victim, she testified that she could not state who had fired the four other shots prior to her turning around. Additionally, Washington testified that she observed Brian Massey holding a weapon she described as “[a] big one, like a long one. Probably a little longer than my arm,” and the defendant holding “a small one.” And although defendant contends that it is impossible for Washington to have observed such events due to the distance at which Washington was standing, the evidence recovered at the scene, in addition to other witness testimony presented by the State at trial, is consistent with her testimony.
First, Sergeant McGuffie testified that during her surveillance of 2120 Constantine, known to be Brian Massey’s residence, and where both Brian Massey 11fiand the defendant were seen leaving on the day of their arrest, she took a photograph of a white SUV parked in front of the residence. The description of the white SUV matches the description of the vehicle provided by Washington that was driven by Brian Massey, with the defen *465 dant in the passenger seat, on the evening of the murder.
Second, around the vicinity of the victim’s body, multiple 7.62 caliber shell casings, and one 9 mm shell casing were recovered. Additionally, a loaded 9 mm pistol was retrieved from the vehicle seat pouch directly in front of where the defendant was seated at the time of his arrest. The 9 mm handgun found in the seat pouch was proven to match the 9-millimeter casing found at the scene of the murder and the bullet retrieved from the victim’s thigh. Finally, a DNA profile obtained from the swab of the slide of the 9 mm pistol was consistent with a mixture of DNA from at least two individuals. Specifically, the State’s DNA expert testified that the defendant fell within the .1 percent of the Caucasian, African-American, Hispanic population that could not be excluded as a minor contributor to the DNA mixture.
In addition to the physical evidence presented by the State at trial, the State also offered a theory as to the motive behind the murder. It was established that two days prior to the murder a shooting occurred in which the defendant’s cousin was shot. Additionally, prior to the murder, the defendant’s brother Brian Massey had been shot in the foot. Brian Massey informed detectives that he believed a man by the name of Johnny Bush, either a cousin or brother of victim Harold Bush, had shot him.
Regardless of whether the defendant fired the shot that killed the victim, we find the defendant was at least a principal to the second degree murder of Harold Bush. Thus, when viewing the evidence in a light most favorable to the 117prosecution, we find that a rational trier of fact could have found that the defendant had the specific intent to kill Harold Bush beyond a reasonable doubt. Accordingly, we find that the evidence presented was sufficient to sustain defendant’s conviction of second degree murder.

ASSIGNMENT OF ERROR NUMBER ONE

Defendant argues that the State presented no legitimate non-racial reason to strike an African American juror by the name of Michael Kellup, thus, the trial court erred in denying defendant’s Bat-son [2] challenge. Specifically, defendant contends that based upon the non-prejudicial responses given by Kellup during voir dire, the State’s decision to wait to utilize a backstrike on Kellup after it was determined that other African American jurors were not going to be stricken, in addition to the fact that the prosecution had already been found guilty of violating Bat-son in the first trial of this case which ended in a mistrial, established that a pri-ma facie case of discrimination was proven. Thus, defendant argues that based on the failure by the State to offer a valid race-neutral reason for striking Kellup, the trial court should have found that he was dismissed based upon his race, and this ultimately prevented the defendant from receiving a fair trial.
In response, the State argues that it offered a valid, race-neutral reason for its peremptory strike of Kellup which is fully supported by the record. Specifically, the State contends that the trial court found there was no pattern of discrimination. Second, despite finding the absence of a pattern, upon request, the State provided a race-neutral reason for exercising the strike, explaining that Kellup had indicated that he had been arrested for failure to pay child support and felt that he had been treated unfairly. Thus, the State main *466 tains that such a situation presented a substantial ground for bias against the State.
11sDuring the first venire, the State exercised two peremptory challenges and the defense exercised three. The racial composition of the jury venire and empaneled jury are not evident in the record.
During the second venire, the State excused one potential juror and the defense excused four. Again, the racial composition of the jury venire is not evidenced in the record, however, on defendant’s third peremptory challenge of Frederick Zander in the second panel, the State asserted a Batson challenge arguing that the defense had stricken exclusively white individuals, five of whom were male and one of whom was female. The trial judge stated that it was unsure as to whether there was a pattern and allowed the defense the opportunity to set forth its reason for challenging Zander, which the trial court found acceptable.
.During the third venire, the State excused three potential jurors and the defense excused two. The State used its fourth peremptory challenge to strike Geraldine Louis, a black female juror. The defense urged a Batson challenge, similar to the one previously asserted in the jury selection of the first attempted trial of this case, claiming a pattern of discrimination. The State responded that it had only exercised two peremptory challenges thus far, one of which was against a white individual. Finding no pattern, the trial court denied defendant’s Batson challenge. The State then used its fifth peremptory challenge to strike Renee Edwards, an African American female. During a bench conference regarding the third panel, all counsel agreed to accept Michael Kellup, a black male juror.
With two jurors and two alternates left to be chosen, in the fourth jury venire, both the State and defense accepted Holly Howart as the eleventh juror. Before accepting Cecile Thompson, a black female juror, as the twelfth juror, the State elected to use its tenth peremptory challenge to backstrike Michael Kellup, a 119black male juror who had been previously accepted in the third panel. The following colloquy ensued:
MR. CLAUSS:
I back strike Mr. Kellup. In anticipation of Mr. Riehlmann’s Batson’s challenge, I’d point out that I’d stricken—
[[Image here]]
MR. RIEHLMANN:
All right. Judge, I’m making a Bat-son challenge again. I think that the court corporate [sic] the preemptory challenge that were used in the jury selection in the other case that resulted] in a mistrial, and I think the State found Mr. Kellup acceptable yesterday and is now exercising a back strike for a racial discriminatory reason.
[[Image here]]
THE COURT:
First, let me — and you can offer your reasons certainly. But as stated this morning and yesterday in response to a Batson, I found that there had been no pattern in this trial, and there continues to be no Batson. I have the State struck a white female, Veronica Haydel—
MR. RIEHLMANN:
But that’s my point. You haven’t been comforted [sic] with any black jurors. Until we’ve got to Ms. Thompson, you haven’t been confronted with a nonwhite juror. Ms. Thompson apparently is, and now you are back striking a black juror. So, *467 so far today, there couldn’t have been any evidence of a pattern.
[[Image here]]
MR. CLAUSS:
I said if it were the case, Mike, that my reasons were not race neutral, and the only thing I wanted was white jurors, I think it stands good reason that I would [not] have struck Ms. Haydel [a white female]—
The trial court went on to note that although it did not find a pattern in this case, because there was a pattern in the previously attempted trial, in which a mistrial was declared, the trial court asked the State to provide its reason. In support of its backstrike of Kellup, the State advised the court that when it had previously accepted Kellup, it had inadvertently overlooked a note it had written during voir dire where Kellup had indicated that he had been arrested for failure to pay child support and that he felt like he had been treated unfairly. The State further asserted that because “Fordie” (phonetic) in the District Attorney’s Office prosecutes failure to pay child support cases, the State argued that substantial | grounds for bias against the State existed. The State further argued that Kellup would have been challenged for cause had it not overlooked its notes. In response, the defense argued that when speaking about his child support case, Kellup never referenced the District Attorney’s Office, nor was there any evidence regarding the exact details other than the fact that the judge put him in jail for a few days. The defense further asserted that in reference to his unfair treatment, Kellup stated that the judge, not the District Attorney’s Office treated him unfairly with respect to his case.
The trial court found that the State articulated legitimate non-discriminatory race-neutral reasons for backstriking Kell-up, observing that the court’s notes also reflected that Kellup stated that he believed he was not treated fairly by the State. The trial court further noted that the State, despite defense counsel’s contentions, had not stricken all the black jurors, rather, the court indicated for the record that four black jurors had already been chosen to serve on the jury.
An accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily and the number of challenges shall be fixed by law. LSA-Const. art. 1, § 17. “In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant.” LSA-C.Cr.P. art. 799.
The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. See Batson v. Kentucky, supra. The Bat-son decision is codified in LSA-C.Cr.P. art. 795(C), which provides that no peremptory challenge made by the State or the defendant shall be based solely upon the race of the juror. Article 795(C) further provides that if an objection is made that the State or defense has |2; excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror.
In Batson, the United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of prospective jurors were based on race. State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535. Under Batson and its progeny, the *468 defendant challenging the peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the State to articulate a neutral explanation for the challenge. Third, the trial court then must determine if the defendant has carried the ultimate burden of proving purposeful discrimination. State v. Sparks, 88-0017 (La.5/11/11), 68 So.3d 485.
To establish a prima facie case, the defendant must show: (1) the prosecutor’s challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of his being a member of that cognizable group. Id. This three-prong showing by the defendant gives rise to “the necessary inference of purposeful discrimination” by the prosecutor. Id. “The inference is ‘necessary* because if such an inference cannot be drawn from the evidence presented by the defendant, he is unable to make a prima facie case of purposeful discrimination and his Batson challenge expires at the threshold.” Id. If the trial court determines the defendant failed to establish the threshold requirement of a prima facie case, then the analysis is at an end and the burden never shifts to the prosecutor to articulate neutral reasons. Sparks, supra.
lagHowever, a trial judge’s demand that a prosecutor justify his peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 288. In any case, after the State offers a race-neutral explanation for the peremptory challenge, and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing becomes moot. Id.
In determining whether the defendant has established a prima facie case of purposeful discrimination in the State’s use of its peremptory challenges, the trial court should consider all relevant circumstances, including any pattern of strikes by the State against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of the peremptory strikes was motivated by impermissible considerations, the composition of the venire and the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination. Id. The overall racial composition of the venire and the jury ultimately seated is a significant factor often considered in determining whether a pri-ma facie case has been established because it provides a “point of reference.” State v. Holand, 10-0325 (La.App. 4 Cir. 4/18/11), 64 So.3d 330.
If the prima facie showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Jacobs, supra (citing Batson, 476 U.S. at 97-98, 106 S.Ct. at 1723-24). This second step does not demand an explanation that is persuasive, or even plausible. Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam). The race-neutral explanation must be one that is clear, reasonably specific, legitimate and related to the case at bar. State v. Collier, 553 So.2d 815, 820 (La.1989).2s At the second step of the Batson inquiry, the issue is the facial validity of the prosecutor’s explanation. Purkett, supra. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race-neutral. Id.
*469 The trial court must then determine whether the defendant has established purposeful discrimination. Jacobs, supra (citing Batson, 476 U.S. at 98, 106 S.Ct. at 1724). It is at this third step that implausible explanations offered by the prosecution “may (and probably will) be found to be pretexts for purposeful discrimination.” Jacobs, supra, (quoting Purkett, 514 U.S. at 768, 115 S.Ct. at 1771). The final step of Batson involves evaluating the persuasiveness of the justification proffered, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. Purkett, 514 U.S. at 768, 115 S.Ct. at 1771. A defendant has the burden to establish discrimination in jury selection. In determining whether a defendant has met his burden of showing purposeful racial discrimination in the State’s exercise of peremptory challenges, the proper question is whether the proof offered by the defendant, when weighed against the State’s proffered race-neutral reasons, is strong enough to convince the trier of fact that the claimed discriminatory intent is present. State v. Bourgeois, 08-457, pp. 9-10 (La.App. 5 Cir. 12/16/08), 1 So.3d 733, 738, writ denied, 09-0336 (La.11/6/09), 21 So.3d 298. Thus, the focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. State v. Tilley, 99-0569, p. 5 (La.7/6/00), 767 So.2d 6, 12, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). The Supreme Court has held “[i]f a prosecutor’s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson’s ^third step.” Miller-El v. Dretke, 545 U.S. 231, 241, 125 S.Ct. 2317, 2325,162 L.Ed.2d 196 (2005).
A trial judge’s findings on a claim of purposeful discrimination are entitled to great deference by the reviewing court because they depend largely on credibility evaluations. Credibility can be measured by factors including the prosecutor’s demeanor, how reasonable or how improbable the explanations are, and whether the proffered reason has some basis in accepted trial strategy. State v. Wilson, 09-170, p. 13 (La.App. 5 Cir. 11/10/09), 28 So.3d 394, 405, writ denied, 09-2699 (La.6/4/10), 38 So.3d 299. The trial judge has the advantage of observing the characteristics and demeanor of the attorneys and prospective jurors. Therefore, the court occupies the best position for deciding whether a discriminatory objective underlies the peremptory challenges. Id. “[A] trial court’s ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.” Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008) (citing Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991)). “The trial court plays a unique role in the dynamics of a voir dire, for it is the court that observes firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript.” State v. Juniors, 03-2425, p. 32 (La.6/29/05), 915 So.2d 291, 319, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006). The Constitution forbids even the striking of a single prospective juror for a discriminatory purpose. See Snyder, 552 U.S. at 478, 128 S.Ct. at 1208.
The Supreme Court subsequently affirmed and applied the three-part Batson test in Miller-El and Snyder. In Miller-El, the Supreme Court emphasized the trial | ^judge’s responsibility to assess the plausibility of the prosecutor’s proffered *470 race-neutral reason “in light of all evidence with a bearing on it.” Miller-El, 545 U.S. at 251-52, 125 S.Ct. at 2331-82. The Supreme Court further stated:
A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.
Miller-El, 545 U.S, at 252, 125 S.Ct. at 2332.
Subsequently, in discussing the third step of the Batson inquiry in Snyder, the Supreme Court stressed the trial judge’s pivotal role in determining the plausibility of the State’s race-neutral explanation. The Supreme Court explained that the third step requires the trial court to evaluate the prosecutor’s credibility by assessing “not only whether the prosecutor’s demeanor belies a discriminatory intent, but also whether the juror’s demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.” Snyder, supra. Referencing its earlier 'decision in Miller-El, the Supreme Court again stressed that “all of the circumstances that bear upon the issue of racial animosity must be consulted” in determining whether the explanation given for the strike is convincingly race-neutral. Snyder, supra.
On appeal, defendant challenges the trial court’s ruling denying defendant’s Batson challenge, and accepting the alleged race-neutral reason offered by the State for the backstriking of a black male juror, Kellup. We find the trial court properly denied defendant’s Batson challenge.
As previously discussed, the State elected to use its tenth peremptory challenge to backstrike Kellup after the eleventh juror had been selected, but before the twelfth juror, a black female, had been accepted from the fourth jury venire. The defense raised its Batson challenge asserting that because the State l^had previously found Kellup acceptable, in addition to the fact that the trial court had found a Batson pattern in the first attempted trial, the backstrike was necessarily for racial discriminatory reasons. The trial court explicitly determined that no pattern existed but allowed the State to present its race-neutral reasons in light of the fact of the pattern found in the previously attempted trial. After the State noted that it had inadvertently overlooked a note regarding its intention on challenging Kellup for cause based on Kellup’s child support case and assertion of unfair treatment by the State, the trial court denied defendant’s Batson challenge.
Although the trial court found that the defendant had not met his initial burden of establishing a prima facie case of purposeful discrimination, it allowed the State to present its race-neutral reasons. And because the State offered a race-neutral explanation and the trial court ruled on the ultimate question of intentional discrimination, rendering the preliminary issue of whether the defendant made a prima facie showing moot, the focus of the inquiry here shifts to whether the.State offered a constitutionally acceptable race-neutral reason for the peremptory challenge of Kellup. See Green, supra.
Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered is deemed race-neutral. Purkett, supra. In the instant case, we find that the State’s explanation is based on something other than Kellup’s race, namely, his bias against the State attributable to his unfair treatment during a child support proceeding which resulted in his arrest.
*471 The purpose of voir dire examination is to develop the prospective juror’s state of mind not only to enable the trial judge to determine actual bias, but to enable counsel to exercise his intuitive judgment concerning the prospective jurors’ possible bias or prejudice. Trahan v. Odell Vinson Oil Field Contractors, Inc., 295 So.2d 224, 227 (La.App. 3 Cir.1974). As stated in United States v. Mutchler, 559 F.2d 955 (5th Cir.1977), allowing “peremptory challenges represent an assumption in our adversary system that a party and his advocate can frequently discern bias in a prospective juror that cannot be extracted from his mouth in so many words.” Here, the race-neutral reason offered by the State was Kellup’s potential bias based on his previous arrest and treatment during a child support case in which he was put in jail by the judge. Specifically, during voir dire, Kellup was questioned regarding his arrest to which he responded:
Yeah. I’ve been arrested for child support a few times. I don’t think I was treated fairly in one of the cases because I had just gotten a job, and they sent me a subpoena to go to court, and I told the Judge as soon as I make my first payday, I will give you something. They still locked me up. I don’t think that was fair.
The trial court noted that its record also reflected that Kellup was arrested for failing to pay child support, and believed he was not treated fairly by the State. Thus, we find the trial court did not abuse its discretion in determining that the State had offered a non-discriminatory raee-neu-tral reason for striking Kellup.
Additionally, as correctly noted by the State in its brief, Louisiana jurisprudence has recognized child support issues as a basis for bias and a suitable race-neutral explanation in support of peremptory challenges. (See State v. Jones, 41,449 (La. App. 2 Cir. 9/20/06), 940 So.2d 61, 77-78; State v. Dobbins, 28,975 (La.App. 2 Cir. 12/11/96), 685 So.2d 446).
Moreover, although the defendant argues that during voir dire Kellup stated that he could follow the law despite the child support matter, the jurisprudence is well established that mere reliance on a prospective juror’s assertion that he or she will be fair and impartial despite such bias is not binding on the court. State v. Lewis, 391 So.2d 1156 (La.1980); State v. Freeze, 438 So.2d 1340 (La.App. 3 Cir. 1983), writ denied, 466 So.2d 465 (La. 1985); State v. Sylvester, 400 So.2d 640 (La.1981). Additionally, if the revealed details of the relationship are such that | jibias or prejudice may be reasonably implied, a juror may be properly refused for cause. Freeze, swpra; Lewis, supra; State v. Monroe, 366 So.2d 1345 (La.1978), cert denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983).
In the present matter, the State had intended to challenge Kellup for cause based on the referenced bias however, the State had overlooked its notes and sought to correct its mistake by exercising a peremptory challenge after the noted bias was realized. And to further substantiate the State’s position, the trial court also stated that its notes reflected that Kellup believed he was treated unfairly by the State in his child support case. Therefore, the trial court obviously made an implicit finding that despite his assertion that nothing would affect his judgment in the case, the pending child support case posed a sufficient threat to his objectivity to support the peremptory challenge. Finally, the trial court noted for the record that four black jurors had already been accepted to serve on the jury in this case.
Thus, based on the record, we find the trial court did not abuse its great discre *472 tion in finding that the State provided race-neutral explanations for its peremptory challenge of Kellup. The record reflects that the trial court’s notes reflected the same concerns as the State’s regarding Kellup’s bias given his previous issues with his child support case, and that the trial court carefully considered the responses of both the State and the defense prior to making its ruling. In view of the vast amount of discretion to be accorded to the findings of the trial court in assessing intent and judging credibility of prospective jurors, we find that the trial court did not err in accepting the reasons given by the State as being race-neutral and without discriminatory intent.

ASSIGNMENT OF ERROR NUMBER TWO

Defendant contends that the trial court erred in denying his motion to suppress the gun recovered from the red Pontiac in which defendant was a backseat passenger. Specifically, defendant asserts that it was not reasonable for the police to believe that evidence of a shooting, which occurred five days earlier, would be found in the red Pontiac, a car which was not the subject of a search warrant or the vehicle used in the perpetration of the crime. Thus, the defendant argues that since a reasonable belief that evidence from the crime might be found inside the vehicle was lacking, the firearm retrieved from the pouch in the back seat of the red Pontiac was illegally seized and should have been suppressed.
Because this matter was litigated during the course of pre-trial proceedings, the State argues that the doctrine of “law of the case” is applicable and thus, this Court should decline further review. Nevertheless, the State submits that should reconsideration of this issue be afforded, relief would not be warranted because the trial court record does not establish that this Court’s previous determination was patently erroneous and/or produced an unjust result. Additionally, the State, in the alternative, argues that even if it was not reasonable for the officers to believe that evidence of the murder would be found in the defendant’s vehicle pursuant to the requirements set forth in Gant, if the officers were acting upon applicable binding precedent at the time of the search, the evidence seized is not subject to the exclusionary rule. Finally, the State contends that application of the automobile exception to the warrant requirement further justified the search.
On May 31, 2007, the defendant filed a motion to suppress the evidence. The suppression hearings on defendant’s motion were held on July 15, 2009, and September 24, 2009.
lanDetective Daniel Jewell, of the Jefferson Parish Sheriffs Office, testified at the hearings that he and other officers were conducting surveillance of a house on Constantine Street while waiting for Detective David Morales to obtain an arrest warrant for defendant in connection with a homicide that occurred on November 24, 2006, when he had the opportunity to participate in the arrest of the defendant.
Detective Jewell further testified that he was aware of some of the facts surrounding the arrest warrant of defendant for the murder of Harold Bush. Specifically, Detective Jewell explained that there had been several murders and retaliatory shootings in the Lincolnshire area, and that it was believed that the murder of Bush was retaliatory for something that Bush, or one of his family members, had done.
While conducting the surveillance, Detective Jewell testified that two males, the defendant and co-defendant, and one female were seen leaving the surveillance *473 address on Constantine Street in a red Pontiac. Thus, Detective Jewell, and other officers, stopped the red Pontiac at a red light at the intersection of Betty Street and Lapalco Boulevard with weapons drawn, and removed the occupants. According to Detective Jewell, at the time of the stop the defendant was seated in the rear seat directly behind the driver. There was also a male driver (co-defendant, Brian Massey) and a female passenger seated in the front seat that were pulled from the vehicle. Detective Jewell testified that he escorted the defendant from the vehicle and placed him in handcuffs. Afterwards, he searched the vehicle and found a “high point” gun in a pouch behind the driver’s seat. Detective Jewell described the pouch as a storage area sown into the back of the driver’s seat.
Detective Jewell further testified that pursuant to seizing contraband from the suspects, he performed a cursory search of the vehicle where the defendant had been seated and found a 9 mm pistol in a pocket behind the driver’s seat. |s. Detective Jewell explained that the pocket where the gun was found was not a “locked container,” however, he did have to pull the pocket away to reveal the gun. Detective Jewell also testified that he did not remove the gun at that point, but after determining that no one else was present inside the vehicle, deemed the vehicle safe. At the time of the search, Detective Jewell stated that the suspects were fully under control, in handcuffs, and were not resisting.
Next, Detective David Morales, with the Jefferson Parish Sheriffs Office, testified at the hearings that he learned that a white Toyota SUV was the vehicle that the perpetrators were in at the time of the murder. He further testified that in the course of his investigation of the murder of Bush, he developed the defendant and Brian Massey as possible suspects. Thus, he obtained search warrants for property related to the suspects, which contained a list of specific items including: any and all firearms that fired 7.62 by 39 cartridges or component parts of same; all 7.62 by 39 and 9 mm ammunition; and any and all firearms that fired 9 mm caliber cartridges or component parts of same.
Detective Morales asserted that one of the search warrants obtained was for 2120 Constantine, and upon execution of the warrant, several items were seized including an SKS semi-automatic rifle with a magazine that was 7.62 by 39 caliber, and a contract with a lock receipt for a U-Haul unit. Detective Morales further testified that a second search warrant for 2076 Mathers Drive in Marrero was executed; however, no evidence was collected from that location. Finally, the third search warrant, for the U-Haul facility, was executed and seven ounces of crack cocaine was seized.
When Detective Morales obtained the warrants, he advised Lieutenant Gerdes, who was conducting a surveillance of 2120 Constantine at the time. Detective Morales specifically advised Lieutenant Gerdes that he had obtained a ^search warrant for 2120 Constantine, and an arrest warrant for the defendant and Brian Massey for the first degree murder of Bush in which there were two weapons used including: a 9 mm handgun and an AK 47. Detective Gerdes was also informed that cars may have been involved in the shooting.
After providing the officers with the warrant information over the radio, Detective Morales learned that the suspects were seen leaving 2120 Constantine in a red Pontiac.[3] Detective Morales arrived in *474 time to observe detectives Jewell and Gerdes arresting the defendant and Brian Massey, thus, detective Morales proceeded to 2120 Constantine to execute the search warrant previously obtained.
Finally, Detective Morales testified that the reason he obtained three search warrants was because he believed there might be evidence of the murder at one of the subject locations, including weapons or parts of weapons that could be matched to the cartridge casings found at the murder scene.
The trial court denied the motion to suppress on October 30, 2009. Thereafter, defendant filed a timely writ application with this Court challenging the trial court’s ruling on the motion to suppress. This Court granted review but denied relief, finding as follows:
In this writ application, Eric Massey seeks review of the trial court’s denial of his motion to suppress evidence obtained after his arrest on a valid warrant. In support of this argument, relator cites Arizona v. Gant, [556] U.S. [382], 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). In Gant, defendant was arrested for driving with a suspended license and placed in the back of a patrol car. When officers searched his vehicle, they found cocaine in a jacket in the back seat. Id. at 1714. In those circumstances, the Supreme Court deemed the warrantless search of Gant’s vehicle inappropriate because the authorities “could not reasonably have believed” that evidence of the offense for which Gant was arrested might be found in his car. Id. at 1719.
In its opposition, the State counters that the trial court was correct in denying defendant’s motion to suppress evidence because, the Gant court further concluded that “circumstances unique to the automobile context |ssjustify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle.” Id. at 1714. We agree.
In this case, Jefferson Parish Sheriffs officers testified at the suppression hearings that Harold Bush was shot on November 24, 2006. At the Bush murder scene, officers found seven spent cartridges consistent with “7.62 x 39 caliber” and “9 mm” rounds. Further, information from witnesses indicated that the fatal shots were fired from a vehicle as it drove by the victim. After investigation, JPSO obtained an arrest warrant in connection with Bush’s murder for Eric Massey and others. Further, JPSO obtained search warrants for several locations, including 2120 Constantine Street.
On November 29, 2006, JPSO officers with other law enforcement officers were watching the house at 2120 Constantine Street. As they awaited the issuance of the arrest and search warrants, a man fitting Eric Massey’s description and two other people left 2120 Constantine, entered a red vehicle, and drove away. Once the lead officer notified the other officers that the warrants had been issued, several officers stopped the red vehicle, removed its occupants, and arrested Mr. Massey and the other occupants. One of the other occupants possessed a firearm capable of firing 9 mm rounds. Mr. Massey possessed illegal narcotics. Immediately after arresting Mr. Massey, an officer observed another weapon capable of firing 9 mm rounds in the vehicle near the spot *475 where Mr. Massey was seated. The weapon was confiscated. As noted above, Mr. Massey seeks to have evidence of that weapon suppressed under Gant.
Here, we find that the trial court was correct in finding that the 9 mm weapon was lawfully seized. The Gant court reiterated that, “If there is probable cause to believe a vehicle contains evidence of criminal activity, United States v. Ross, 456 U.S. 798, 820-821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), authorizes a search of any area of the vehicle in which the evidence might be found.” Arizona v. Gant, 129 S.Ct. at 1714. Here, it was reasonable to conclude that this vehicle contained evidence of criminal activity connected to Harold Bush’s fatal drive-by shooting, particularly firearms. Accordingly, upon review, relator’s requested relief is denied.
State v. Massey, 09-1078 (La.App. 5 Cir. 1/13/10)(unpublished opinion).
The arguments presented by defendant here are essentially the same as those made in his writ application. Thus, the threshold issue involves the applicability of the doctrine of “law of the case.”
Under the discretionary principle of “law of the case,” an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case. State v. Junior, 542 So.2d 23, 27 (La.App. 5 Cir.1989), writ denied, 546 So.2d 1212 (La.1989); State v. Burciaga, 05-357, p. 5 (La.App. 5 Cir. 2/27/06), 924 So.2d 1125, 1128. The principle is applicable to all decisions of an appellate court; not solely those arising from full appeal. State v. Johnson, 06-859, p. 12 (La.App. 5 Cir. 4/11/07), 957 So.2d 833, 840. One reason for imposition of the doctrine is the avoidance of indefinite re-litigation of the same issue; but it will not be applied in cases of palpable former error. Id. Reconsideration is warranted when, in light of subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Davis, 03-488, p. 6 (La. App. 5 Cir. 11/12/03), 861 So.2d 638, 641, writ denied, 03-3401 (La.4/2/04), 869 So.2d 874; In re K.R.W., Jr., 03-1371, p. 4 (La. App. 5 Cir. 5/26/04), 875 So.2d 903, 905.
Here, defendant has failed to cite to any new facts adduced at trial or additional jurisprudence tending to indicate that this Court’s prior disposition was patently erroneous and produced an unjust result, thus, we find the law of the case doctrine applicable to this assignment and we refuse to reconsider our previous ruling finding the trial court correctly denied defendant’s motion to suppress.

ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, defendant argues that the trial court erroneously denied his motion to sever the defendants in this case which in turn resulted in the deprivation of his Sixth Amendment right of confrontation by allowing the admission of inculpatory statements made by his co-defendant, Brian Massey, without the opportunity of cross-examination and in violation of Bruton.[4]
In response, the State asserts that Bru-ton is not applicable to the facts of this case, thus, severance of the defendants was properly denied. Specifically, the State contends that the conversation at issue, a jailhouse recorded statement between cajdefendantss Brian Massey and his father, was admissible because the statements were not testimonial, or facially incriminating, and a proper limiting instruc *476 tion was provided. Finally, under the harmless error standard, the State contends that sufficient evidence was presented at trial to convict defendant despite the admission of the subject statement.
LSA-C.Cr.P. art. 704 provides the following regarding severance:
Jointly indicted defendants shall be tried jointly unless:
(1) The state elects to try them separately; or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance. '
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, 741 (La.1984); State v. Foret, 96-281, p. 35 (La.App. 5 Cir. 11/14/96), 685 So.2d 210, 224. A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court. Cedrington, 98-253 at 23, 725 So.2d at 577. A denial of a motion to sever will not be overturned absent a clear abuse óf discretion. Pru-dholm, 446 So.2d at 741.
A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State. Prudholm, 446 So.2d at 741; Cedrington, 98-253 at 23-24, 725 So.2d at 577. The defendant bears the burden of proof in a motion to sever. State v. Jackson, 03-883, p. 16 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 851-52, writ denied, 04-1399 (La.11/8/04), 885 So.2d 1118. Antagonistic defenses are not the only instances where the denial of a motion to sever will constitute an abuse of discretion. Where the ends of justice will be best served by severance, it should be granted. Cedrington, 98-253 at 24, 725 So.2d at 577-78 (citing State v. Webb, 424 So.2d 233 (La.1982)).
In Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Supreme Court commented that joint trials play an important role in the criminal justice system,' as they promote efficiency and serve the interest of justice by avoiding the inequity of inconsistent verdicts. The Zafiro Court found that severance is not mandated whenever codefendants have conflicting defenses, even if a defendant is prejudiced by the joinder. It is up to the district court’s discretion to tailor the relief, if any, to be granted to the prejudiced party.
The Zafiro Court commented that when defendants have been properly joined, a district court should grant a severance only when a specific trial right of. one of the defendants might be compromised, or where there is a risk that the jury will arrive at an unreliable verdict. “Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.” Zafiro, 506 U.S. at 534, 113 S.Ct. at 935. See also State v. Johnson, 96-0959 (La.6/28/96), 675 So.2d 1098.
The testimony at issue here, which forms the basis of defendant’s assignment of error regarding severance of the defendants, deals with a tape recorded jailhouse telephone conversation played for the jury, between co-defendant Brian Massey and his father on April 23, 2010. The underlying facts surrounding the basis for the co-defendant’s conversation dealt with information obtained by the lead investigator, Detective Morales, pertaining to a potential witness. Specifically, Detective Morales learned through the course of his investigation that the victim had been with a *477 man by the name of Ron Sherman, also known as “LA,” at the time he was killed. Sherman agreed to meet with |S7Petective Morales and provide a statement regarding the homicide but was unable to identify the individuals who had shot the victim.
During the jailhouse tape recorded conversation, Brian Massey was heard telling his father to meet up with “LA” and to tell “LA” to go to his lawyer and give a recorded statement saying “that it wasn’t me and Brad who did that s* * *. Because he [LA] made a statement and he made the statement saying that he ... can’t identify the people who did it. But he said that he saw who did it, but he can’t identify them. He can identify me and Brad because he know us.... So all you got to do is let me lawyer record him on a tape saying it wasn’t Brad and Brian who did that, and they going to drop the f* * * * *g charges.... Tell that n* * * *r I got $500.00 and all for him just saying that, fool.”
On August 25, 2010, the morning of trial, the trial court listened to the jailhouse tape and also heard argument from the State and defense regarding defendant’s motion to sever the defendants based on Brian Massey’s conversation with his father. During oral argument, the State asserted its intent to introduce Brian Massey’s conversation, stating that it showed an attempt at tampering with a witness and also contradicted the statement that Ron Sherman gave to the police in which he stated that he could not identify the person who committed the crime. The defense then argued that it was inconceivable to believe that the State would not be using the conversation for the “truth of the matter,” arguing that during his phone conversation, Brian Massey put himself and his brother at the scene of the murder. Thus, under Bruton, because defendant would not be able to cross-examine Brian Massey at trial regarding the subject “confession,” the defense argued that grounds for severance existed. During rebuttal, the State argued that Bruton is inapplicable to the statement made by Brian Massey because under Bruton, those statements which do not specifically reference the co-defendant, and |SRare not inculpato-ry on its face unless connected with other evidence, are admissible. Thus, because the defendant was not specifically referenced in the tape, and the only way that the evidence may be used to establish second degree murder is when it is taken in conjunction with other significant evidence, the State asserted that defendant’s motion should be denied. After hearing oral argument, the trial court denied defendant’s motion to sever, finding: “I don’t find the statement inculpatory. I don’t think its Bruton or Crawford. So I’m going to allow the statement, and I’m not going to grant the motion to sever.” Trial commenced, the jailhouse tape recorded telephone conversation was played for the jury, and during the State’s closing argument, defendant moved for a mistrial based on the State’s reference to the tape, which the trial court denied. Finally, pri- or to releasing the jury for deliberations, the trial court gave the following instruction:
In this case, you heard evidence of statements made by Brian Massey. This evidence is competent evidence against Brian Massey. However, evidence concerning any statements made by Brian Massey is inadmissible hearsay against Eric Massey. Therefore, you may not consider any statement made by Brian Massey when determining Eric Massey’s guilt or innocence.
On appeal, defendant complains that the trial court deprived him of his Sixth Amendment right of confrontation by allowing the admission of inculpatory *478 statements made by his co-defendant, Brian Massey, when defendant did not have the opportunity to cross-examine him. However, based on the facts of this case the holding in Bruton is inapplicable to this case.
The Supreme Court held in Bru-ton, supra, that in a trial where two or more defendants are tried jointly, the admission of a non-testifying co-defendant’s confession that expressly implicates the defendant violates the defendant’s Sixth Amendment confrontation rights, even if the district court gave the jury limiting instructions to consider the confession only against the co-defendant who |S9confessed. Bruton, 391 U.S. at 126, 88 S.Ct. 1620; United States v. Escobar, 50 F.3d 1414, 1422 (8th Cir.1995). “If a co-defendant’s confession does not incriminate the defendant on its face, but does so only when linked to additional evidence, it may be admitted if a limiting instruction is given to the jury and the defendant’s name is redacted from the confession.” Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In other words, the co-defendant’s Confrontation Clause rights are not violated if the hearsay only incriminates the co-defendant “inferentially,” in a way that will be possible for the jury to put out of mind. See Gray, 523 U.S. at 195-96, 118 S.Ct. 1151.
In addition, Bruton does not apply at all when a co-defendant’s statements do not incriminate the defendant either on their face or when considered with other evidence. Escobar, supra. See also State v. Brooks, 98-0693 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, unit denied, 99-2519 (La.2/25/00), 755 So.2d 247. In Bruton, the co-defendant’s confession expressly implicated the defendant as his accomplice. Bruton, 391 U.S. at 141-142, 88 S.Ct. 1620.
In this case, the discussion between Brian Massey and his father does not facially incriminate the defendant. Brian Massey’s statement to his father requesting that he speak to “LA” does not reference the defendant, Eric Massey, but rather uses the defendant’s nickname “Brad” during his conversation. The indirect reference to the defendant could not be linked and/or understood without the other evidence adduced at trial such as Courtney Washington’s passing testimony regarding the defendant’s nickname, and Detective Morales’ testimony regarding “LA.”
Additionally, even though defendant asserts that the tape constitutes a “confession,” it can be argued that Brian Massey’s taped conversation is not incriminating even when considered with the other evidence introduced at trial. In |4nfact, it could be inferred that when Brian Massey stated “he can’t identify the people who did it. But he said that he saw who did it, but he can’t identify them. He can identify me and Brad because he know[s] us,” he was hoping to use the statement given by “LA” to establish him and his brother’s innocence. Moreover, the trial court determined that the substance of the conversation was not inculpatory and did not believe that it put them at the scene. “It just says that they have knowledge, they know each other.” Therefore, we find that Bruton is not applicable in this case because co-defendant, Brian Massey’s, statement by itself does not implicate defendant, Eric Massey, in any wrong-doing. Nowhere in Brian Massey’s statement does he identify the defendant as the shooter, nor does Brian Massey’s statement indicate that the defendant was at the scene of the murder.
Even if found to implicitly incriminate the defendant after considering the evidence presented at trial, it is noted that the trial court gave an explicit jury instruction regarding the tape recorded conversation, admonishing the jury to “not *479 consider any statement made by Brian Massey when determining Eric Massey’s guilt or innocence.”
Furthermore, there is no Bruton issue in this case because, like Crawford,[5] Bruton is a Confrontation Clause case and may arguably be limited to testimonial statements. And although Crawford did not fully define the term “testimonial,” Crawford and its progeny has provided accepted examples of testimonial statements, such as ex parte in-court testimony (e.g., affidavits, custodial examinations, pri- or testimony, pretrial statements), and has generally defined the term as including statements “made under circumstances which would lead an |41 objective witness reasonably to believe that the statement would be available for use at a later trial.” Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354.
The State cites to United States v. Castro-Davis, 612 F.3d 53, 65 (1 Cir.2010), certs. denied, — U.S. -, 131 S.Ct. 970, 178 L.Ed.2d 797 (2011) and — U.S. -, 131 S.Ct. 1056, 178 L.Ed.2d 874 (2011), in support of its contention that defendant’s statements to his father are non-testimonial in nature and thus, defendant is denied relief under Bruton. Castro-Davis appears persuasive on this issue. In Castro-Davis, ' during his pre-trial incarceration, the defendant spoke to his mother over the telephone. The conversation was recorded. During the course of his conversation, the defendant told his mother that “Neliza is the one who is talking,” and “That b* * * * is going to f* * * us over.” As to his co-defendant Gabriel, he stated, presumably in reference to the police: “They have a picture of him and everything. I saw it.” The trial court allowed the admission of defendant’s statements made to his mother into evidence at trial, and the defendant appealed arguing that its admission violated his Confrontation Clause rights under Crawford and Bruton. The First Circuit determined that the trial court properly admitted the statements finding that the recorded conversation was non-testimonial, thus, Bruton was not implicated.
In this case, the recorded telephone conversation between the co-defendant and his father was made under circumstances in which it appears to be non-testimonial in nature and thus, does not violate the defendant’s Sixth Amendment right to confrontation and cross-examination of Brian Massey.
Finally, even if the trial court erred in admitting Brian Massey’s jailhouse telephone conversation at the joint trial, it does not appear to be reversible error. In State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the Louisiana Supreme Court explained:
Confrontation errors are subject to a harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. Id. at 684, 106 S.Ct. 1431. Factors to be considered by the reviewing court include “the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contracting the testimony of the witness on material *480 points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.” Id. at 684, 106 S.Ct. 1431; State v. Wille, 559 So.2d [1321] at 1332 [ (La. 1990) ]. The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
The jailhouse tape recorded telephone conversation was not necessary to the State’s case. There would have been sufficient evidence to prove defendant’s guilt as to the second degree murder of Bush without its admission. In light of the evidence presented at trial of defendant’s guilt, as addressed in response to defendant’s insufficiency assignment, including eye witness testimony and the defendant’s connection to one of the weapons used to shoot Bush, we find that the guilty verdict was surely unattributable to any error in admitting Brian Massey’s jailhouse telephone conversation with his father. Therefore, we find that the trial court did not err in finding Bruton inapplicable and in denying defendant’s motion to sever.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent in this case.
^Accordingly, we affirm defendant’s conviction of second degree murder and affirm the sentence 'imposed by the trial court.

AFFIRMED

. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. Id. Therefore, the sufficiency of the evidence is addressed before defendant’s other assignments. See also State v. Nguyen, 05-569, p. 6 (La.App. 5 Cir. 2/3/06), 924 So.2d 258, 262.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69(1986).

. The vehicle the suspects were in was the same car that was originally parked in front *474 of 2120 Constantine Street, the residence for which Detective Morales had obtained the search warrant.

. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), holding that the Confrontation Clause bars the admission of an out-of-court "testimonial” statement against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.