FREDERICKA HOMBERG WICKER, JUDGE
*384 Defendant, Furnell D. Daniels,[1] was found guilty of manslaughter in violation of La. R.S. 14:31 for the death of his fourteen-year-old son, J.D., and seeks the reversal of his conviction and sentence. Defendant assigns the following issues for review: 1) whether the trial court erred in denying the defense's Batson / J.E.B. challenge to the State striking African-American prospective jurors; and 2) whether the trial court erred in imposing the maximum sentence for a first time offender with evidence of mitigation throughout the trial. We find that under the facts presented, the trial court neither erred in denying defendant's Batson/J.E.B. challenge nor in giving defendant the maximum sentence under the law. Accordingly, for the following reasons, we affirm defendant's conviction and sentence.
PROCEDURAL HISTORY
On June 9, 2016, a Jefferson Parish Grand Jury indicted defendant with second-degree murder of fourteen-year-old J.D.,[2] in violation of La. R.S. 14:30.1. Defendant pled not guilty at his June 29, 2016 arraignment, and subsequently filed motions to suppress evidence taken from his home[3] and statements he made to first responders and officers. His motions were denied on May 10, 2017, and on the same date, the trial court granted the State's motion to introduce other crimes evidence pursuant to La. C.E. art. 404(B). Defendant's trial commenced on November 14, 2017, before a twelve-person jury. At the trial's conclusion, the jury found defendant guilty of the lesser included offense of manslaughter in violation of La. R.S. 14:31. On November 27, 2017, defendant filed a motion for new trial making several arguments including that the trial court erred in denying his Batson challenge during jury selection, the verdict is contrary to the law and evidence presented by the State, and the State violated the court ordered sequestration of the victim's brother, Nell, which the trial court denied on the same day. After a waiver of sentencing delays by defendant, the trial court sentenced defendant to forty years imprisonment with the Department of Corrections and credit for time served.[4] The trial court further recommended drug treatment and any self-help programs available to defendant through the Department of Corrections during his time of incarceration. On December 14, 2017, defendant filed a motion to reconsider sentence, *385 which the trial court denied on December 22, 2017.
On February 14, 2018, defendant filed a pro se motion for appeal, which the trial court granted as an out-of-time appeal the following day. Defendant now appeals, arguing the trial court erred in denying his Batson/J.E.B. challenge and in imposing a maximum forty-year sentence for a first time offender.
FACTS
At trial, Latonya Kelly, mother of the victim, J.D., and the victim's brother, Fernell, Jr. ("Nell"), testified that in February of 2016, J.D. and her son Nell were living with their father - defendant. Ms. Kelly stated that she was living in Baton Rouge at the time with her two eldest daughters Savari and Juresia. On February 6, 2016, Ms. Kelly's son Nell telephoned her at work to inform her that J.D. had "an accident" and was at the hospital. Upon arrival at the hospital, a doctor informed Ms. Kelly that J.D. was "dead upon arrival." However, J.D. remained on life support for approximately one week to ensure he was in fact "brain dead" until all life sustaining measures were ceased. Ms. Kelly testified that she did not speak to defendant about what happened upon her arrival at the hospital or since the incident.
On February 6, 2016, at approximately 12:30 p.m., Captain Samuel Craigie and Larry Frederick, firefighters with the Live Oak Manor Volunteer Fire Company, responded to a call for service at 73 Clifford Court in Waggaman, Louisiana. It was reported to them that a fourteen-year-old male had fallen in the bathtub and hit his head rendering him unconscious. Upon arrival at the residence, Captain Craigie testified that their knocks went unanswered for a long period of time until Nell opened the door. Captain Craigie observed J.D. in the living room lying on the sofa in defendant's lap. He inquired of defendant as to what had happened at which time defendant informed him that he had attempted to discipline J.D. who ran away from him and slipped. Defendant later advised Firefighter Frederick that J.D. had fallen in the bathtub the night before and had awoken that morning appearing very "sluggish." Defendant further indicated that when he attempted to reprimand J.D., J.D. took off running and fell. Defendant told Firefighter Frederick that it had been approximately thirty minutes from the time J.D. had fallen to the time he called 9-1-1 because he wanted to see if J.D. could "sleep it off."
The firefighters performed an assessment, at which time they found that J.D.'s pulse was high, his respirations were shallow, and his pupils were fixed. Captain Craigie testified that large fixed pupils are often associated with head trauma or a drug-related overdose; thus, he asked defendant whether there were any medications in the house that J.D. might have "gotten into." Defendant responded that he did not think there were but then retrieved a full bottle of pills, stating, "it could have been this." J.D.'s condition quickly began to deteriorate and firefighters initiated CPR until EMS arrived. Firefighter Frederick recalled that J.D. had three abrasions that were scabbed over on his forehead, swelling above one eye, and a number of bruises on his abdomen and one of his arms.
West Jefferson Hospital Paramedic Matthew Perkins arrived on the scene and took over from the fire department personnel administering CPR and advanced care to J.D. who at this time did not have a pulse. In addition to administering epinephrine, which was successful in regaining J.D.'s pulse, Paramedic Perkins administered Narcan for any possible drug overdose. Paramedic Perkins explained that there are no negative effects of administering *386 Narcan to a patient who has not ingested any drugs. He further testified that he also observed bruising and swelling on J.D.'s body in various stages of healing.
Detective Nicholas Sanderson of the Jefferson Parish Sherriff's Office also responded to the 9-1-1 call initiated by defendant on February 6, 2016. Upon his arrival, he spoke with defendant who stated that J.D. had fallen the previous day and that he was fine until he went unresponsive. After relocating to the hospital, Detective Sanderson spoke to defendant who informed him that he was angry with Nell and J.D. for their poor school grades so he "paddled" them with a thin piece of wood. He further explained that J.D. was "squirming" around which caused him to be struck in both the front and back approximately three to five times before defendant moved on to Nell. After defendant finished with Nell, he went back to J.D. who attempted to run away from defendant and tripped near a coffee table in the living room where a chair fell on top of him. Defendant stated that he then chased J.D. into the bedroom at which time J.D. slipped and fell for a second time, hitting his head on the bed's box spring. J.D. relayed to defendant that his head hurt, but defendant indicated that he did not take his son's complaint seriously because J.D. often exaggerated his symptoms to escape further punishment. Defendant further told Detective Sanderson that later that night he heard a loud "thud" coming from the bathroom where he witnessed J.D. slumped over the bathtub. He admitted to Officer Sanderson that he had observed the bruising on J.D.'s body, including those on his legs and shoulders, and defendant conceded that he caused some of these by paddling J.D. Defendant then stated that he moved J.D. from the bathroom into his bedroom, wrapped his shoulder, gave him some pain medication, and kept him awake for a while in case of a concussion.
Defendant told Detective Sanderson that the following morning, around 7:00 or 8:00 a.m., J.D. woke up complaining of head pain and began vomiting. Defendant informed Detective Sanderson that later on J.D. started making gurgling noises and became unresponsive. Detective Sanderson also observed J.D.'s injuries while at the hospital and spoke to the treating physician, Dr. Roxanne Thompson, who stated that J.D.'s injuries were indicative of physical abuse.[5]
Dr. Roxanne Thompson was the pediatric emergency room physician who treated J.D. She testified that he was unresponsive when he arrived at the hospital and presented with abrasions around his forehead and face and bruises and abrasions on his extremities. Dr. Thompson explained that J.D. had suffered an epidural hemorrhage with death due to brain injury. Dr. Thompson also performed a skeletal examination reporting the presence of fractures in various locations of J.D.'s body including on his forearm near his wrist, and his right kneecap. Dr. Thompson testified that she spoke with the neurosurgeon who had been consulted on J.D.'s case and felt that J.D.'s condition had progressed so far that removing the blood on his brain to try to relieve the pressure would not help him. The neurosurgeon then relayed to Dr. Thompson his belief that had J.D. been brought to the hospital sooner, he would have been able to save his life. Based on *387 the totality of the injuries sustained by J.D., Dr. Thompson did not believe them to be consistent with a single fall, noting that a great deal of force would have had to be employed to cause an epidural hematoma and a fractured kneecap.
Dr. Thompson also had the opportunity to speak with defendant who informed her that J.D. was a "problem child" and that he had reprimanded him the night before for receiving bad grades in school. He also told Dr. Thompson that because J.D. had tried to run from him, he chased him around their home so he was unsure which parts of J.D.'s body had been hit with the "board" he was using. He also mentioned to Dr. Thompson that J.D. had fallen at least once and that J.D. had complained of a headache and pain.
Jefferson Parish Sheriff's Office Homicide Detective Gabriel Faucetta testified that he obtained a search warrant for defendant's home based upon the information Officer Sanderson, the hospital staff, and J.D.'s older brother Nell provided him. During the search of the home, detectives seized a crib rail which was identified as the weapon defendant used on J.D. Detectives also found and photographed damage to sheetrock in the home, which they concluded was caused by the same crib rail. Detective Faucetta also obtained and executed a search warrant on defendant's cellular phone. A forensic examination of defendant's phone revealed that immediately before defendant called 9-1-1, at 12:22 p.m., he called his wife, Terri Daniel. Additionally, a text message sent a few hours after 9-1-1 was called, at approximately 4:13 p.m., read "[m]aybe I'm me trying to chastise him. Just don't know. It could be drugs." After the autopsy was performed, defendant was arrested for second-degree murder.[6]
Detective Faucetta further testified that on February 15, 2016, Ericka Dupepe of the Children's Advocacy Center (CAC) interviewed Nell and his two younger siblings, Gabriella Daniel and Jasiah[7] Simmons, who also lived with their father-defendant. As a result of the children's interviews, Jefferson Parish Sherriff's Office obtained and executed a second search warrant for defendant's home during which officers seized metal tent poles which the children identified as items used by defendant as past weapons during beatings.
Dr. Neha Mehta, medical director of the Audrey Hepburn Care Center at Children's Hospital and expert in general pediatrics and child abuse pediatrics, testified that she interviewed and evaluated Nell on March 3, 2016. At the time of her examination she observed no physical injuries on Nell despite him having informed her that he himself also sustained injuries on the same date as J.D. However, Dr. Mehta testified that she did not expect to see any injuries or marks on Nell at the time of her examination based on the remoteness of the February 5-6, 2016 event.
Additionally, Dr. Mehta explained that the history Nell provided to her regarding the events that occurred on the date in question was in her opinion consistent with child physical abuse. She further recalled that when providing his medical history, Nell relayed to her that defendant would strike him and J.D. with a wooden crib rail approximately three feet in length and two inches in width, and a metal tent pole. Dr. Mehta also learned that J.D. had been *388 treated on a previous occasion at Children's Hospital on December 11, 2009, having reportedly been disciplined by defendant who struck him in the face with a belt when he tried to escape punishment.[8] Dr. Mehta reported that she examined photographs from the December 2009 incident which also appeared consistent with child abuse.
Dr. Mehta further testified that she reviewed the medical records from the February 2016 incident and concluded that J.D.'s injuries were not consistent with a single fall in a bathtub or a fall on a carpeted floor. Rather, she believed J.D.'s injuries to be consistent with the account of the events relayed by Nell of the physical child abuse suffered at the hands of defendant. Dr. Mehta confirmed that J.D. would have been in significant pain as a result of his injuries and that it would have been very difficult for him to bear weight on his leg where he sustained a fractured kneecap. She further concluded that had defendant and his wife sought medical care for J.D. after his symptoms appeared, medical intervention would have changed his chance for survival.
Dr. Susan Garcia, the forensic pathologist who performed the autopsy on J.D. on February 11, 2016, testified that J.D. was pronounced brain dead on February 8, 2016. Based on her examination, she found J.D. died of an epidural hemorrhage due to a skull fracture, measuring a little over two inches, from blunt force trauma. Contusions on J.D.'s head indicated that he sustained three blows to the head. In addition, Dr. Garcia stated that multiple areas of his body were also subjected to blunt force trauma including his torso, upper body, and lower extremities. On the back of J.D.'s left arm beneath his elbow were also some small contusions. Dr. Garcia explained that the location of the contusions were consistent with a defensive injury. She further opined that the injuries J.D. sustained were not the result of a fall, and based on her observations, she determined the manner of death as a homicide.
Marie Kerrin was a child protection investigator with DCFS at the time of J.D.'s death. On February 6, 2016, Ms. Kerrin's on-call supervisor- Lashonda Dorcey- notified her of J.D.'s hospitalization. As part of her investigation, she went to the hospital and spoke with medical personnel and had the opportunity to observe J.D.'s injuries. Ms. Kerrin also spoke with defendant after his arrest who informed her that he was disciplining his two sons because of their school grades and J.D. would not remain still to "take the discipline, which was 15 hits with paddles." He explained to Ms. Kerrin that J.D. was running away from him and that he chased him and continued to strike him. He admitted that he caused J.D. to sustain bruising and was aware of a "knot on his knee and his shoulder." Defendant further told Ms. Kerrin that he was "concerned at various times," and told J.D. "if this gets too bad let me know, but you need to suck it up." Defendant also relayed that J.D. fell in the bathtub and had to be carried back to his bedroom, acknowledging that he was aware his son was injured.
Ms. Kerrin also testified that defendant had been investigated by DCFS on prior occasions for child abuse, resulting in two valid findings of abuse in 2009.
Nineteen-year-old Juresia Daniel, J.D.'s sister, testified that she lived with her mother in Baton Rouge. She stated that she did not live with defendant prior to 2016, however, she would occasionally visit defendant at his home. She recalled a time when J.D. was approximately six or seven *389 years old, and she witnessed defendant "whipping" J.D., who tried to run away but was caught by defendant. Juresia stated that J.D. was lying on his stomach when defendant put his foot on his back and "whipped" him with a belt. Juresia also testified regarding incidents of abuse that she had suffered at the hands of defendant. She discussed an incident when defendant hit her with a hanger multiple times on her legs and struck her giving her a black eye when she was in middle school.[9] Juresia testified that she stopped visiting her father because she "didn't like catching all the whippings and all the rules," and because she was scared of him.
Twenty-two-year-old Savaria Kelly testified similarly to Juresia, explaining that she lived with her mother but occasionally visited her father. She also testified regarding an incident involving her father when she was seven or eight years old and her sister Juresia was five or six. She recalled that Juresia left the bread tie off the bread bag and also lied about having ironed her clothes, so defendant chased her around "whipping" her with a belt. Savaria decided when she was twelve or thirteen that she would not visit defendant again.
Sixteen-year-old Nell testified that on February 5, 2016, defendant picked him up from school after having spoken to his teacher regarding his grades. Nell recalled that on the way to the car they began to argue at which time defendant "jabbed" him. Defendant was angry with Nell about his poor grades and told him "I'll deal with you when I get home." After they arrived home, at around 3:00 p.m., J.D. was also getting home from school. Nell recalled that when J.D. arrived, defendant was yelling and told them to "turn over" as punishment for their bad grades. Defendant told them that they would each get fifteen "licks" in increments of five with a stick taken from his sister's crib. Nell went first, and after he had taken his first five "licks," it was J.D.'s turn. Nell testified that defendant struck J.D. who kept moving away, which caused another "lick" to be added. After Nell's second round, J.D. was hit two more times before he started to move away again because he did "not want to take his five," stating that he was hurt and asking defendant to stop. Nell recalled that after his last five "licks," J.D. was in a chair saying, "I'm hurting. I'm hurting"; however, defendant went over and started hitting him. J.D. tried to run away, but defendant chased him, striking him while he ran. Nell tried to intervene but was unsuccessful.
At one point when J.D. ran away, Nell could hear screaming and chairs falling. Nell eventually saw J.D. on the ground in his room crying and unable to get up. Nell attempted to help his brother up, but defendant stopped him; a few minutes later Nell observed J.D. stand up, after defendant denied him help, but Nell noticed that J.D. was not walking normally as if something was wrong with his knee. Nell testified that he also observed "scrapes" on J.D.'s legs, a scar above his eye, "marks" on his collar bone, his shoulder, and his neck, and that his wrist was swollen. Both defendant and Nell put ice on J.D.'s wrist and collar bone. Nell testified that J.D. repeatedly stated that he was hurting.
Nell further testified that later that evening, he and defendant heard a "thump" coming from the bathroom. When they went to check on the noise, J.D. had fallen and they tried to help him up. Defendant *390 then assisted J.D. to his room and Nell subsequently assisted J.D. to a couch in the living room. Nell recalled that his father then left the house to pick up his wife, Nell's step-mother, Terri. Nell testified that it was at that time that he really saw the extent of J.D.'s injuries, and that J.D. informed him "I think I hit my head."
When defendant and Terri arrived back home they brought with them a heating pad and medicine. According to Nell, Terri was "acting terrified" after checking on J.D. and asked defendant if he was sure he did not need to go to the doctor. J.D. refused to eat that evening and defendant assisted him to his bedroom at approximately 10:00 p.m. At approximately 5:00 a.m., J.D. woke Nell complaining of neck pain and feeling hot. He also asked Nell to get defendant for him. When defendant entered the room, J.D. urinated on himself and vomited. Terri also came into the room at that time and stated that J.D. should be brought to the doctor, to which defendant replied, "if he gets anymore worse, we're going to bring him to the doctor." Terri and defendant then got into a "disagreement," after which she went back to their bedroom. Nell went back to sleep and awoke at 9:00 a.m. to find J.D. on the couch saying his head hurt, while holding his collar bone. Nell believed that J.D. looked worse than the day before. Nell further recalled that he, J.D., and defendant were praying, and that around noon that day defendant called 9-1-1 when J.D. became unresponsive.
The State rested and the defense called defendant to the stand. Defendant, father of seven, testified that he was an associate minister and that he tried to run his household in accordance with the dictates of the Bible. He further explained that J.D. and Nell were both struggling in school. On Friday, February 5, 2016, after defendant received J.D.'s and Nell's school progress reports, he told the boys that they would each get fifteen "licks" for their poor grades. Defendant explained that he grabbed the "paddle" and that J.D. was trying to talk him out of receiving his punishment and then took off running so defendant moved on to Nell.
After Nell had received five "licks," defendant went back to J.D. who kept "defying" him, but defendant reassured J.D. that he was going to "get this whipping one way or the other." Defendant stated that he was trying to hit him along the "lower extremities ... to make sure I didn't hit him in his head," but J.D. kept moving and fighting him. He recalled that J.D. then got up, ran into the hallway and tried to grab the stick from defendant after "lick" number four. According to defendant, it was at that time that J.D. hit the wall, damaging the sheetrock, to which defendant responded, "man, you're going to pay ... you're going to get it ... you're going to get these licks today." Defendant was able to then go back to Nell and finish giving him his "licks" before going back to J.D. who was still resisting. Defendant recalled that he and J.D. were fighting over the stick but that defendant was able to stand up and hit J.D. on the shoulder. He "refused to let him get away," and by the fourth "lick" out of nine, defendant told J.D. to "just hold still and take the licking." According to defendant, J.D. then got up and ran into the bedroom, fell, and hit his head on the bed and the dresser. Defendant testified that he was out of breath at that point and decided to go back into the living room when he heard J.D. say he was hurt and needed help.
When Nell asked defendant if he was going to go help J.D., defendant testified that he replied, "no, boy. [J.D.'s] just faking. You know I didn't hit him in the room." He also told Nell not to go into the bedroom because J.D. was "just performing"
*391 and that he did not need any help. Defendant testified that J.D. eventually came into the living room, walking with a limp and complaining of shoulder pain. Defendant admitted that he was responsible for the injuries J.D. sustained to his shoulder, wrist, and knee, realizing the mistake he had made. He further explained that he examined J.D.'s injuries and asked him if he wanted to go to the hospital but that J.D. said "no, I think I'm straight." Defendant further explained that he and Nell put ice on J.D. and then defendant left to pick up his wife from work. When he returned, he had Epsom salt and some medicine because he was "concerned" about J.D.'s shoulder.
Later that evening, defendant testified that he heard a "thump" coming from the bathroom and went in to find J.D. on the floor in the shower. According to defendant, J.D. informed him that he had slipped and fallen while attempting to take a shower. Defendant stated that he then waited for J.D. to finish taking his shower before helping him to his room. Defendant further testified that when he asked J.D. if he needed to go to the hospital, J.D. responded that he was "good."
The next morning, around 5:00 a.m., defendant testified that he was awoken by Nell who informed him that J.D. needed him. When he checked on J.D., J.D. told him that he was hot and that his head was hurting. He also observed that J.D. had urinated in the bed, so he told him that he was "too big" for that, to which J.D. informed him that he could not make it to the bathroom. Defendant explained that he lifted J.D. up to bring him to the living room so he could keep an eye on him, when J.D. vomited. Defendant admonished J.D., stating, "I told you you should have ate something ... I shouldn't have given you that medicine on no empty stomach." Defendant testified that it was at that time that defendant realized there was something wrong but did not know what. He further explained that his wife Terri was "freaking" wanting J.D. to go to the hospital, so defendant asked J.D. if he needed to go to the hospital and he said "no dad." Defendant testified that he realized now that it was a mistake and that he should have taken him to the hospital from the very beginning. He further told the jury that he should not have been using a "paddle" but that at the time he believed that if he "spared the rod" he would "spoil the child." He accepted responsibility for causing J.D.'s death but explained that it was never his intention to kill him.
ASSIGNMENTS OF ERROR
Defendant argues two assignments of error on appeal. First, defendant argues that the trial court erred in denying the defense's Batson/J.E.B.[10] challenge of the state striking African-American prospective jurors. Second, defendant avers that the trial court erred in imposing the maximum sentence for a first time offender with evidence of mitigation throughout the trial.
DISCUSSION
Assignment of Error One: Batson Challenge
In his first assignment of error, defendant argues that the trial court erred in denying his Batson challenge after making a prima facie showing that the State engaged in a discriminatory pattern of striking prospective African-American jurors, and that the State failed to provide valid *392 race neutral reasons for the strikes. In furtherance of his claim, defendant argues that the reasoning given by the State for striking African-American jurors was not sufficient to strike Caucasian jurors with the same or similar answers. He further argued that the reasons for striking the African-American jurors were either unfounded, vague or illogical. As defendant believes that he was denied a trial by his peers, he concludes that the trial court erred when it failed to grant his motion for new trial.[11] Upon a complete review of the Batson hearing and the voir dire record, we find no error in the trial court's ruling denying defense's Batson challenge.
The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. In Batson v. Kentucky , the United States Supreme Court held that an equal protection violation occurs when a party uses a peremptory challenge to exclude a prospective juror on the basis of race. 476 U.S. 79, 94-98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Louisiana legislature codified the Batson decision in La. C.Cr.P. art. 795(C), which provides that no peremptory challenge made by the State or the defendant shall be based solely upon the race or gender of the juror. State v. Massey , 11-357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 467, writ denied , 12-991 (La. 9/21/12), 98 So.3d 332. Article 795(C) further provides that if an objection is made that either the State or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand satisfactory race-neutral reasons for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror.
The Court in Batson outlined a three-step test for determining whether a peremptory challenge was based on race. State v. Cheatteam , 07-272 (La. App. 5 Cir. 5/27/08), 986 So.2d 738, 743. Under Batson , the defendant challenging the peremptory strike must first establish a prima facie case of purposeful discrimination. State v. Victor , 11-45 (La. App. 5 Cir. 11/15/11), 82 So.3d 301, 311. Second, if a prima facie showing is made, the burden shifts to the State to articulate a race-neutral explanation for the challenge. State v. Sparks , 88-0017 (La. 5/11/11), 68 So.3d 435, cert. denied , 566 U.S. 908, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012). Unless discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Purkett v. Elem , 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam ); State v. Massey , 91 So.3d at 468. Third, the trial court then must determine if the defendant has carried his or her ultimate burden of proving purposeful discrimination. Sparks , supra . The ultimate burden of persuasion as to racial motivation in exercising a peremptory challenge rests with, and never shifts from, the opponent of the challenge. Purkett , 514 U.S. at 768, 115 S.Ct. at 1771 ; Hernandez v. New York , 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).
To establish a prima facie case, the defendant must show: (1) the prosecutor's challenge was directed at a member of a cognizable group; (2) the challenge *393 was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of his being a member of that cognizable group. Massey , supra , (citing Sparks , supra ). If the trial court determines the defendant failed to establish the threshold requirement of a prima facie case, then the analysis is at an end and the burden never shifts to the prosecutor to articulate neutral reasons. Massey , 91 So.3d at 468.
However, a trial judge's demand that a prosecutor justify his peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose. Id. If the prima facie showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Id. In any case, after the State offers a race-neutral explanation for the peremptory challenge, and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing becomes moot. Id.
Whether there has been intentional racial discrimination is a question of fact. State v. Edwards , 06-643 (La. App. 5 Cir. 3/27/07), 957 So.2d 185, 194, writ denied sub nom. State ex rel. Edwards v. State , 08-1988 (La. 8/29/08), 989 So.2d 110. The trial court's evaluations of discriminatory intent are to be accorded great deference on review, and should not be reversed unless they are clearly erroneous. See State v. Florant , 12-736 (La. App. 5 Cir. 5/23/13), 119 So.3d 635, 642, writ denied , 13-1451 (La. 1/10/14), 130 So.3d 319.
Batson - Step One
In the present matter, defendant made a Batson challenge to the State's use of peremptory challenges exercised on perspective jurors who were African-American. The record indicates that the trial court called two venire panels. During the first venire, the State utilized seven peremptory challenges, and used six of the challenges to excuse the following African-American jurors, Danielle Bannister, Hanna Trufant, Victor Carmon, Shelia Taylor, Evona Smith, and Shirley Brown. Upon review of defendant's Batson challenge, the court found that of the twenty-one potential jurors, seven were African-American and the State exercised peremptory challenges on six of the seven. Thus, the trial court found a prima facie case of purposeful discrimination had been established.
After listening to the explanations for the exercise of challenges given by the State, the trial court ruled:
For purposes of the record, I do believe that Mr. Burns [defense counsel] pointed out or established a prima facie issue of black jurors being cut kicks in the Batson Challenge which requires the State to provide a race neutral reason for the cuts.
Here, we find that defendant satisfied the first step of Batson . See Sparks , 68 So.3d at 473 ; State v. Allen , 03-2418 (La. 6/29/05), 913 So.2d 788, 798, cert. denied , 547 U.S. 1132, 126 S.Ct. 2023, 164 L.Ed.2d 787 (2006) ; Massey , 91 So.3d at 468. Therefore, our attention shifts to whether the State offered constitutionally acceptable race-neutral reasons for the peremptory challenges exercised against Ms. Bannister, Ms. Trufant, Mr. Carmon, Ms. Taylor, Ms. Brown, and Ms. Smith.
Batson - Steps two and three
The second step of the Batson analysis is to determine if the State met its burden of providing race-neutral reasons for exercising its peremptory strike.
*394 State v. Wilson , 40,767 (La. App. 2 Cir. 8/23/06), 938 So.2d 1111, 1126. The third and final step requires the trial court to determine if the defendant has carried the ultimate burden of proving purposeful discrimination. Sparks , supra .
In determining whether the State's explanations were sufficiently race-neutral, the State need not provide an explanation that is persuasive, or even plausible. See Massey , supra . Rather, a race-neutral explanation must be clear, reasonably specific, legitimate, and related to the case at bar. State v. Perrilloux, 03-0917 (La. App. 5 Cir. 12/30/03), 864 So.2d 843, 847-48, writ denied, 04-0418 (La. 6/25/04), 876 So.2d 830. If the explanation is facially valid and does not contain an inherently discriminatory intent, the reason offered will be deemed race-neutral. Massey , supra .
Prospective Juror Bannister
During voir dire , the State questioned prospective jurors regarding their ability to fairly apply the burden of proof imposed on the State because defendant faced a life sentence. After the trial court provided an explanation of the definition of the reasonable doubt standard, Ms. Bannister expressed her concern over a life sentence without the possibility of parole and stated that the State would "have to prove without reasonable doubt for me to like really say I'm going to go with him being guilty and giving him life without parole." However, Ms. Bannister ultimately indicated that she could overlook the fact that defendant could receive a life sentence if she was convinced beyond a reasonable doubt.
In offering a race neutral reason for striking Ms. Bannister, the State argued that she had an issue with imposing a life sentence on defendant and stated she would hold the State to a higher burden. The State also explained it chose to strike Ms. Bannister because she had a family member who was accused of a crime.
In reviewing the validity of the State's reasoning, this Court has found that a juror who has a family member with a criminal record is a race-neutral explanation. See State v. Wilson , 09-170 (La. App. 5 Cir. 11/10/09), 28 So.3d 394, 404 n.4, writ denied , 09-2699 (La. 6/4/10), 38 So.3d 299 (citing State v. Baker , 34,973 (La. App. 2 Cir. 9/26/01), 796 So.2d 145, 154 ). Additionally, this Court has found that a prospective juror's holding the State to a higher burden of proof is a valid race-neutral reason for a peremptory strike. See State v. Florant , 12-736 (La. App. 5 Cir. 5/23/13), 119 So.3d 635, writ denied , 13-1451 (La. 1/10/14), 130 So.3d 319.
We find that as to Ms. Bannister the State met its burden of proof under the second step of the Batson analysis in that it provided a race-neutral explanation for exercising a peremptory strike which was clear, reasonably specific, legitimate, and related to the case at bar.
Turning to Batson 's third step, in response to the State's reasoning, defense counsel identified Caucasian jurors who were accepted by the State who "said the same thing" as Ms. Bannister. The court acknowledged defense counsel's position, specifically identifying a Caucasian juror - Wesley Martinez- who stated that he also would hold the State to a higher burden, then subsequently stated he would follow the law and was accepted by the State.
The Supreme Court has held that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson 's third step."
*395 Miller-El v. Dretke , 545 U.S. 231, 241, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005). In Snyder v. Louisiana , the Supreme Court also explained that the third step requires the trial court to evaluate the prosecutor's credibility by assessing "not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." 552 U.S. 472, 477, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008).
Here, as indicated by the trial court, while Mr. Martinez expressed reservations about the State's burden, he ultimately stated that he would follow the law, and indicated that he could return a guilty verdict despite the possible imposition of a life sentence if he was "firmly convinced." The trial court found:
Mr. Martinez is the one that the Court looks to as being a white male who also expressed some reservations. However, in looking back at my notes, Mr. Martinez didn't express reservations about the fact that ---the fact that he was guilty would result in a life sentence. He expressed reservations about holding the State to a higher burden but ultimately stated in response to Mr. Burns' questions that he would follow the law and would not hold the State to a higher burden.
Thus, the prosecutor's proffered reason for striking Ms. Bannister did not apply as well to Mr. Martinez. Therefore, as it relates to Ms. Bannister, the trial court did not err in denying the defense Batson challenge.
Prospective Juror Trufant
During voir dire , Ms. Trufant informed the court that she had two first cousins who were murdered and that their murders have not been solved. She also testified that she had problems looking at gruesome photographs and indicated that she or a family member has had problems raising troubled teenagers.
In offering its race-neutral reasons for striking Ms. Trufant,[12] the State asserted that Ms. Trufant would be unable to look at the gruesome photographs, has a family member who has been accused of a crime, has had family members investigated by OCS, and that she or a family member has had "problem teens." Defendant contends on appeal that a juror's "problem" with gruesome photographs is not a race-neutral reason to strike Ms. Trufant. However, a juror's uneasiness about the viewing of gruesome photographs has been upheld as a race-neutral reason for a peremptory strike. See State v. Peters , 13-1110, 2014 WL 1515757 (La. App. 1 Cir. 4/17/14) (unpublished opinion), writ denied , 14-1137 (La. 3/6/15), 161 So.3d 10.
Addressing the third step of Batson , the trial court specifically cited to Ms. Trufant's inability to view gruesome photographs in weighing the State's race-neutral explanation against defendant's prima facie showing and determined that defendant had not carried his burden on the third step. Therefore, in light of the foregoing, and giving great deference to the trial court, we find that the trial court was not clearly erroneous in rejecting defendant's Batson challenge as to Ms. Trufant.
*396 Prospective Juror Taylor, Brown, and Carmon
During voir dire , the State asked prospective jurors if they would be able to find defendant guilty of second-degree murder, knowing that defendant would receive a life sentence, if the State proved its case beyond a reasonable doubt. Ms. Taylor responded that she could not say yes; further explaining that "I wouldn't want him not to be guilty. I think he should have some penalty but I can't see life." Ms. Brown stated that she felt similarly to Ms. Taylor in that "you do deserve a second chance." Mr. Carmon, who has a brother-in-law in law enforcement, initially stated that would be able to return a verdict of guilty knowing that defendant would receive a life sentence; however, he then questioned the State about the definition of life without parole. After a brief discussion, Mr. Carmon confirmed that he could return a verdict of guilty.[13]
In striking Ms. Taylor, Ms. Brown, and Mr. Carmon, the State pointed to each of their initial reservations concerning life without the possibility of parole for a second-degree murder conviction.
Turning again to step two, with specific regard to Ms. Taylor, the defense, once again, stated that there were Caucasian jurors who made similar statements as Ms. Taylor who were not stricken. In agreeing with defense counsel, the trial court once again recalled the statements of Mr. Martinez that he would hold the State to a higher burden and then subsequently said he would follow the law.
The State responded distinguishing Ms. Taylor from Mr. Martinez in stating that unlike Mr. Martinez, Ms. Taylor knew someone who was investigated by OCS. Further, the State pointed to Ms. Taylor's involvement in ministry as a reason for striking her as a juror - recognizing a religious component to the case. In response, defense counsel identified Lawrence Hamm who entered the courtroom with his bible and was not stricken by the State. The State distinguished Ms. Taylor from Mr. Hamm in arguing that Mr. Hamm did not have any issues with OCS in his family and never stated that he was involved in ministry - despite carrying his bible. Further, Mr. Hamm did not have any issue with imposing a life sentence on defendant without the possibility of parole.
As to Ms. Brown, the State argued that it struck Ms. Brown because of her work with abused children in the past and because she was firm in her belief that she has "to give the second chance."
Specifically addressing Ms. Taylor and Ms. Brown, the trial court stated:
[...] at least Ms. Taylor, Ms. Brown and I thought there was one other, certainly Ms. Taylor and Ms. Brown initially gave responses that they wouldn't be able to vote guilty if the defendant, if they knew the defendant was going to get life. They ultimately retracted that and again weren't ultimately cut for cause but as a result I think that is reasonable for the State to cut those two in particular.
Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. State v. Achelles , 16-170 (La. App. 5 Cir. 12/21/16), 208 So.3d 1068, 1074. Here, the State's overarching reason for exercising a peremptory strike of Ms. Taylor, Ms. Brown, and Mr. Carmon was their initial reservation to imposing a life sentence without the possibility of parole. Thus, the State offered a facially race-neutral *397 explanation for the exercise of peremptory challenges against Ms. Taylor, Ms. Brown, and Mr. Carmon. A neutral explanation in this context is simply an explanation based on something other than race. See Wilson , supra , (citing Hernandez , 500 U.S. at 360, 111 S.Ct. 1859 ). The Fourth Circuit has found that reservations about convicting someone of a crime which carries a mandatory life sentence without parole provides sufficient, legitimate, race-neutral grounds based upon which the State could exercise a peremptory strike. State v. McElveen , 10-0172 (La. App. 4 Cir. 9/28/11), 73 So.3d 1033, 1077, writ denied , 11-2567 (La. 4/9/12), 85 So.3d 692. Furthermore, a prospective juror's involvement in church activities and/or their employment field may be a sufficiently race-neutral reason for a peremptory strike. See State v. McDowell , 582 So.2d 364, 365 (La. App. 2nd Cir. 1991), writ denied , 586 So.2d 567 (La. 1991) ; State v. Alexander , 03-1291 (La. App. 5 Cir. 3/30/04), 871 So.2d 483, 489. The purpose of voir dire examination is to develop the prospective juror's state of mind not only to enable the trial judge to determine actual bias, but to enable counsel to exercise his intuitive judgment concerning the prospective jurors' possible bias or prejudice. Trahan v. Odell Vinson Oil Field Contractors, Inc. , 295 So.2d 224, 227 (La. App. 3rd Cir. 1974).
As the State provided race-neutral explanations for exercising a peremptory challenge against Ms. Taylor, Ms. Brown, and Mr. Carmon, we find that it carried its burden of proof in the second step of the Batson analysis. Further, upon review of the record, the defense's race-neutral responses, and the reasons given by the trial court, we find that the trial court was not clearly erroneous in denying defendant's Batson challenges as to Ms. Taylor, Ms. Brown, and Mr. Carmon.
Prospective Juror Smith[14]
The State asserted that it exercised a peremptory challenge against Ms. Smith because she indicated that she had heard about the case, her husband knew defendant, defendant visited her church a few times, and she also was involved in ministry.
As to Ms. Smith, the trial court found:
Ms. Smith is the one who is involved in the ministry issues. I do find that a race neutral reason. That doesn't apply to any of the white people involved.
The only other white juror, potential white juror was Teresa Pizzalato who indicated she was a Eucharistic Minister who was not involved in any particular ministry.
Ms. Smith also indicated that she knew something about the case which provides yet another race neutral reason for her exclusion.
Knowledge of the parties and familiarity with the case constitute race-neutral reasons for a peremptory challenge. See State v. Qualls , 40,630 (La. App. 2 Cir. 1/27/06), 921 So.2d 226, 240. Therefore, we find that the trial court did not err in denying defendant's Batson challenge as to Ms. Smith.
The trial judge's determination regarding purposeful discrimination rests largely on credibility evaluations, and great deference is given to the trial judge in making this determination. See *398 State v. Wilson , 09-170 (La. App 5 Cir. 11/10/09), 28 So.3d 394, 405, writ denied , 09-2699 (La. 6/4/10), 38 So.3d 299 ; Snyder , supra . Therefore, we find that the trial court did not err in denying defendant's Batson challenge or in denying his motion for a new trial on these grounds.
Assignment of Error Two: Maximum Sentence
In his second assignment of error, appellant argues that the trial court erred in imposing the maximum sentence for a first time offender with evidence of mitigation throughout the trial. Defendant contends that there was "solid evidence presented" that he was "extremely remorseful and recognized his own mistake." He further argues that despite stating its reasons for imposing the maximum sentence, the trial court failed to justify why the sentence was warranted given defendant's background. Accordingly, defendant avers his forty-year sentence is excessive.
The State maintains the trial judge expressed an adequate factual basis for the forty-year sentence imposed, and thus, the sentence is not excessive. The State avers that the evidence presented at trial was sufficient to support a conviction for second-degree murder, which carries a mandatory life-sentence, and thus, the trial court did not abuse its discretion in imposing the maximum sentence in this case.
After imposing the forty-year sentence on defendant, the court acknowledged defense counsel's objection to the maximum sentence given defendant's lack of a prior criminal history. The record also reflects that after sentencing, defendant filed a written motion to reconsider sentence pursuant to La. C.Cr.P. art 881.1, based on the alleged excessiveness of his sentence, which the trial court denied on December 22, 2017.
The failure to state specific grounds upon which a motion to reconsider sentence is based limits a defendant to a review of his sentence for constitutional excessiveness only. State v. Warmack , 07-311 (La. App. 5 Cir. 11/27/07), 973 So.2d 104, 108. Accordingly, the only issue before us is whether the trial court erred in denying defendant's motion to reconsider sentence based on constitutional excessiveness.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it may be reviewed for constitutional excessiveness. State v. Smith , 01-2574 (La. 1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson , 04-334 (La. App. 5 Cir. 9/28/04), 885 So.2d 618, 622.
A trial judge has broad discretion when imposing a sentence, and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey , 07-67 (La. App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Pearson , 07-332 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 656. In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the *399 same court and other courts. Id. at 656. Generally, the maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. Id.
Defendant was originally charged with second-degree murder of a known juvenile but convicted by a jury of the lesser offense of manslaughter. Manslaughter is punishable by not more than forty years. La. R.S. 14:31. Defendant received the maximum sentence of forty years. Prior to sentencing defendant, the trial court took into consideration the fact that defendant had been investigated on two prior occasions by DCFS which resulted in valid findings of abuse as to J.D. The trial court also concluded that the discipline described was "beyond what would be allowed in a normal civilized society." The court also expressed its concern for defendant's other children, finding the type of discipline shown in this case might reoccur and result in another tragedy. The trial court further acknowledged defendant's remorse for his actions; however, it found that such remorse does not absolve one from responsibility for his actions. Finally, the court detailed the injuries suffered by J.D. which included multiple wrist fractures, a fracture of the patella, multiple skull fractures, and substantial bruising and cuts, which trial court believed would have alerted any reasonable person that J.D. was in need of immediate medical attention.
Here, while defendant appears to be a first-time offender, as considered by the trial court, defendant had been investigated by DCFS on two prior occasions resulting in findings of abuse with respect to his "disciplining" of J.D. Additionally, defendant's daughters, Savaria and Juresia, both testified that they either witnessed or experienced physical abuse at the hands of their father and as a result, stopped visiting him. Testimony from his son Nell also established that defendant had beaten his children before with not only a wooden crib rail but also a metal tent pole which was recovered from their home.
Further, the egregious nature of the facts of this case was only partially reiterated by the trial court. In addition to those facts cited by the court at sentencing, the facts at trial established that J.D. was beaten by defendant with a wooden crib rail approximately three feet in length, a splinter of which was removed from J.D.'s eyelash. The autopsy examination revealed that J.D. died as a result of an epidural hemorrhage due to a skull fracture measuring over two inches from blunt force trauma. J.D. sustained three blows to his head and multiple blows to areas of his body including his torso, upper body, and lower extremities resulting in a fractured wrist and kneecap. Such fractures, as opined by Drs. Thompson and Mehta, would have resulted in significant, unjustifiable pain. Finally, while defendant expressed remorse for his actions, his testimony at trial also revealed that while he was beating J.D., defendant said that J.D. was "going to pay" and that when Nell attempted to intervene and aid his brother, defendant stopped him, stating "he's just faking." The neurosurgeon who consulted on J.D.'s case as well as Dr. Mehta both opined that had earlier medical intervention been sought out, J.D. would have lived. Instead, the testimony at trial established that defendant left J.D. to suffer from the afternoon of February 5, 2016, until February 6, 2016 at 12:22 p.m., when defendant called 9-1-1 only because J.D. became unresponsive.
Courts have repeatedly upheld maximum forty-year sentences for manslaughter imposed on first offenders under varying factual scenarios.
*400 State v. Jones , 01-0630 (La. App. 4 Cir. 3/20/02), 814 So.2d 623, writ denied , 02-1111 (La. 11/15/02), 829 So.2d 424 (the defendant, charged with second degree murder, was convicted of manslaughter in the shooting death of a man with whom he had fought earlier the same night); State v. Williams , 99-2355 (La. App. 4 Cir. 12/13/00), 776 So.2d 604, writ denied , 01-1829 (La. 4/12/02), 812 So.2d 667 (the defendant, charged with first degree murder, was convicted of manslaughter when he opened fire in the apartment of a man with whom he had previously fought); State v. Soriano , 15-1006 (La. App. 3 Cir. 6/1/16), 192 So.3d 899, writ denied , 16-1523 (La. 6/5/17), 219 So.3d 111 (forty-year sentence for manslaughter where first-time offender stabbed the victim once and after victim retreated, chased him down and stabbed him again).
Additionally, it appears that the evidence adduced at trial would have supported a second-degree murder conviction, resulting in the exposure to a mandatory life sentence under La. R.S. 14:30.1. "In considering the nature of the offense, both the trial court and the reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged." State v. Lewis , 09-1404 (La. 10/22/10), 48 So.3d 1073, 1078 (citing State v. Lanclos , 419 So.2d 475, 478 (La. 1982) ). This general sentencing principle accommodates Louisiana's responsive verdict scheme which provides the fact-finder, ordinarily a jury in felony cases, the discretion to return verdicts for lesser included offenses against the weight of the evidence presented at trial. Id. (citing State v. Porter , 93-1106 (La. 7/5/94), 639 So.2d 1137, 1140 ). Louisiana courts have found the fact that the evidence might have supported a verdict of second-degree murder is an appropriate sentencing consideration where the defendant has been convicted of a lesser offense. Id.
After considering the seriousness of the crime committed in this case which involved the killing of an innocent fourteen-year-old child at the hands of his own father, for which defendant could have been convicted of second-degree murder, we find the maximum forty-year sentence imposed with respect to defendant's manslaughter conviction is not constitutionally excessive despite defendant's lack of a criminal record as it is neither grossly disproportionate to the offense nor does it constitute a needless infliction of pain or suffering. Thus, in light of the facts of the case, the nature of the crime, and the jurisprudence, we find the trial court did not abuse its discretion in imposing a forty-year sentence in this case and in denying defendant's motion to reconsider sentence.
ERRORS PATENT
This Court routinely reviews an appellate record for errors patent in accordance with La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990), regardless of whether a defendant requests an errors patent review. Upon review, the following errors patent require corrective action.
First, while the commitment indicates defendant was properly advised by the trial court of the applicable prescriptive period for post-conviction relief, the transcript indicates that an incomplete advisal was given. Specifically, the trial court informed defendant that he had "two years after the judgment and conviction have become final to seek post-conviction relief," rather than two years after the judgment of conviction and sentence. Where there is a conflict between the transcript and the minute entry, the transcript prevails.
*401 State v. Lynch , 441 So.2d 732, 734 (La. 1983).
As a general rule, if a trial court fails to provide a complete advisal pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief. See State v. Neely , 08-707 (La. App. 5 Cir. 12/16/08), 3 So.3d 532, 538, writ denied , 09-0248 (La. 10/30/09), 21 So.3d 272 ; State v. Davenport , 08-463 (La. App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ denied , 09-0158 (La. 10/16/09), 19 So.3d 473. Accordingly, we hereby advise defendant that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.
Finally, there are several discrepancies between the State of Louisiana Uniform Commitment Order (UCO), the sentencing minute entries, and the record in the case.
The original sentencing minute entry from November 27, 2017, was corrected by a Nunc Pro Tunc minute entry on March 6, 2018, with respect to the concurrent nature of defendant's sentence with any other sentences he may be serving. However, both the original November 2017 minute entry and the corrected March 2018 minute entry contain inapplicable plea language. Additionally, both the original and corrected minute entries incorrectly provide that defendant was found guilty by a jury of the "amended charge" of manslaughter, rather than the lesser included offense of manslaughter.
Further, the original and revised UCO incorrectly reflect the date of the instant offense as February 5, 2016, rather than "on or between February 5, 2016 and February 11, 2016," and incorrectly provide that defendant was convicted on November 18, 2017, when the record reflects defendant was convicted on November 17, 2017.
This Court has previously remanded a case for correction of the sentencing minute entry and UCO in its error patent review. See State v. Lyons , 13-564 (La. App. 5 Cir. 1/31/14), 134 So.3d 36, writ denied , 14-0481 (La. 11/7/14), 152 So.3d 170 (citing State v. Long , 12-184 (La. App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142 ); State v. Roland , 06-0244 (La. 9/15/06), 937 So.2d 846.
Accordingly, defendant's conviction and sentence is affirmed and this matter is remanded for correction consistent with this opinion. Further, the Clerk of Court for the Twenty-Fourth Judicial District Court is to transmit the original of the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department.
AFFIRMED; REMANDED WITH INSTRUCTIONS

Defendant is also known as Furnell D. Daniel.

The victim's initials are used under the authority of La. R.S. 46:1842(3)(a) and La. R.S. 46:1844(W)(3), which allow this Court to identify a victim of a homicide who is also a minor by using his or her initials.

Officers seized varying wood items and crib boards from defendant's home.

The trial court ordered defendant's sentence to be served in the custody of the Department of Corrections. Although the trial court did not state the sentence was to be served at hard labor, "a sentence committing a prisoner to the Department of Corrections is necessarily at hard labor." State v. Lawson , 04-334 (La. App. 5 Cir. 9/28/04), 885 So.2d 618 (citing State v. Lisenby , 534 So.2d 996, 998 (La. App. 3rd Cir.1988) ).

Following Detective Sander's testimony, Kimberly Stierwald, a crime scene technician for the Jefferson Parish Sheriff's Office, then took the stand and testified that she took photographs of J.D.'s body at the hospital. She identified several areas of injury on his body and a wood splinter which had been removed from J.D.'s eyelash.

Defendant was initially arrested for second degree cruelty to a juvenile because J.D. had not been declared brain dead.

The transcript also spells Jasiah's name Josiah. However, consistent with court minutes and the supplemental discovery receipt, the spelling Jasiah will be used hereinafter.

J.D. was seven at the time of this incident.

Juresia testified that defendant slapped her and his watch "caught my face" causing her to sustain a black eye.

Although defendant raises a Batson /J.E.B. challenge before this Court, he fails to argue gender discrimination under J.E.B. v. Alabama ex rel. T.B. , 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) ; therefore, we examine defendant's claim of racial discrimination under Batson .

In denying defendant's motion for new trial, the trial court stated that in the interest of justice, it gave defense counsel a chance to present its case and develop all theories they wished to pursue - "even though some of them were not subsequently verified by substantive evidence"-; and placed no limitations on the length of opening and closing statements and voir dire .

The transcript of the Batson proceeding reveals that defense counsel did not provide a specific challenge to the State's race-neutral reasoning for striking Ms. Trufant. However, as she was identified by the trial court as an African-American prospective juror over whom the State exercised a peremptory challenge, an analysis of the State's reasoning and the trial court's decision under Batson follows.

The transcript of the Batson proceeding reveal that defense counsel did not raise a specific objection to the State's reasoning for the exclusion of Mr. Carmon as a juror.

Noticeably absent from appellant's brief is a discussion of the State's exercise of a peremptory challenge of Ms. Smith; however, as appellant has consistently mentioned the State's use of a peremptory challenge against six of seven African-American potential jurors, and as Ms. Smith was identified by the trial court in its reasons for denying appellant's Batson challenge, we provided a brief analysis of the trial court's decision as it relates to Ms. Smith.